[No. A118911. First Dist., Div. One. July 29, 2008.]

WITT HOME RANCH, INC., Plaintiff and Appellant, v.
COUNTY OF SONOMA, Defendant and Respondent.

544

## COUNSEL

McQuaid Bedford & Van Zandt, Michael J. Van Zandt and Christopher B. Whitman for Plaintiff and Appellant.

Steven M. Woodside, County Counsel, and Sue A. Gallagher, Deputy County Counsel, for Defendant and Respondent.

Dennis Bunting, County Counsel (Solano) and James Laughlin, Deputy County Counsel, for the California State Association of Counties and the League of California Cities as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

MARGULIES, J.—This appeal requires us to address an issue left unresolved in *Gardner v. County of Sonoma* (2003) 29 Cal.4th 990 [129 Cal.Rptr.2d 869, 62 P.3d 103] (*Gardner*): whether a subdivision map approved and recorded under the statutes in effect prior to the state's first

modern land use planning laws, enacted in 1929, is valid under the Subdivision Map Act (Act) (Gov. Code,[1] §§ 66410–66499.37). (*Gardner*, at p. 1001, fn. 7.) We provide the partial answer that the Act's grandfather provisions do not validate subdivision maps approved under the statutes in effect through 1915.

Plaintiff Witt Home Ranch, Inc. (Ranch), is the owner of a large parcel of undeveloped land in Sonoma County (County). In 1915, a map that subdivided the parcel into 25 lots was approved by the County Board of Supervisors (Board) and recorded, but the map was never implemented through sale of the individual lots. Rather, the lots have always been united as a single parcel with a single owner. In 2005, the Ranch applied to the County for certification of the individual lots on the basis of the 1915 map, but the Board ruled that the map was no longer valid.

The Ranch argues that the 1915 subdivision map qualifies under a statutory grandfather provision, section 66499.30, which recognizes antiquated subdivision maps that were recorded in compliance with "law[s] . . . regulating the design and improvement of subdivisions" in effect at the time of the maps' recordation. (*Id.*, subd. (d).) The Ranch also argues that the County's conduct during the application process violated its constitutional right to due process. We agree with the superior court that the laws governing subdivision maps in 1915 did not regulate the "design and improvement of subdivisions," as required by the grandfather clause, and that the County did not violate the Ranch's right to due process, and we affirm.

## I. BACKGROUND

The Ranch is the current owner of the "Houx Subdivision," a 120-acre parcel located outside Petaluma. On December 16, 1915, an earlier owner of the Houx Subdivision recorded a subdivision map of the property (Houx map) showing 25 lots, 21 of them square lots of approximately the same size, with the remaining four lots narrower and beveled. Most of these lots border a road drawn down the center of the property, while the remainder adjoin a then existing public road, now known as Bodega Avenue. Minutes from a 1915 meeting of the Board show that the Houx map was approved before it was recorded.

The Houx map notwithstanding, the Houx Subdivision has never been subdivided in practice, having been owned as a single parcel by the Ranch

---

[1] All statutory references are to the Government Code unless otherwise indicated.

and its predecessors in interest since before 1915.[2] In 2005, the Ranch filed an application with the Sonoma County Permit and Resources Management Department (PRMD), the responsible county agency, seeking certificates of compliance for each of the 25 lots shown on the Houx map, as well as certificates for other parcels owned by the Ranch. Issuance of the certificates of compliance, which confirm that the individual lots comply with subdivision laws and regulations, would have permitted the Ranch to sell the lots individually. The PRMD refused to issue certificates for the Houx map lots, stating that the map "does not meet the criteria allowing recognition of the parcels shown on it as separate legal parcels." The PRMD did, however, agree to issue one certificate for the Houx Subdivision and four certificates for other parcels owned by the Ranch.

The Ranch appealed the PRMD's decision to the Board in July 2005.[3] This was not the first time the Board had considered such a request. At the time the Ranch submitted its application to PRMD, the County was already considering applications by two other county landowners seeking recognition of parcels created by antiquated subdivision maps. Like the Ranch's application, these applications were denied by the PRMD and appealed to the Board. In a May 2005 resolution, the Board denied one of those appeals, providing a detailed analysis of the legal issues bearing on certification.[4] The resolution concluded that the grandfather clause of the Act did not reach a map recorded in 1894, because "the state's first regulation of private subdivision maps, adopted in 1893, simply established very basic technical requirements for recordation of private subdivision maps . . . [and] did not authorize or permit any review or approval of subdivision maps by the local agency." Although this was sufficient to resolve the appeals at hand, the resolution continued, "To provide guidance to staff, this Board has considered each of the State's subdivision regulations enacted between 1893 and 1929. . . . [T]his Board finds that it was not until at least 1919 that state law first provided for some degree of substantive review of the design and improvement of private subdivisions. . . . This Board instead directs staff to continue to review subdivision maps recorded under the 1919 Act on a case by case basis to determine their legal significance. [¶] . . . This Board does find,

---

[2] Contemporary documents submitted by the Ranch demonstrate that the Houx Subdivision was named after Martha Houx, who obtained the property in the settlement of an estate in 1912. The Houx Subdivision was acquired by the forebears of the Witt family, the owners of the Ranch, in 1921, and it has been under Witt family ownership since.

[3] Pursuant to County ordinance, appeals of administrative subdivision decisions are first taken to the county planning commission and then to the Board. (Sonoma County Code, § 25-13.5.) With the Ranch's consent, the Board took original jurisdiction of this appeal, bypassing the planning commission.

[4] We have been cited to only one Board resolution issued in connection with these appeals in the appellate record. There is no dispute, however, that both appeals were denied by the Board.

however, that subdivision maps recorded pursuant to and in compliance with the 1929 Act or any subsequent Act should be deemed to create parcels recognizable by certificate of compliance."

The Ranch's appeal to the Board was denied for similar reasons. In a resolution containing a similarly detailed legal analysis, the Board considered the legislation governing the recordation of subdivision maps when the Houx map was recorded in 1915. The resolution accepted that the Houx map had been properly recorded, in compliance with the statutes in effect at the time. Nonetheless, the Board concluded that those statutes were "essentially surveying regulations, regulating the form, but not the substance of private subdivision maps. . . . The [1915] Act did not give any discretion to the local agency to review, regulate or approve the design or improvement of the subdivision." The resolution contained language similar to that of the prior resolution, stating that maps recorded pursuant to 1919 legislation would be given case-by-case review by the County and maps recorded pursuant to 1929 and subsequent legislation would be recognized.

The Ranch thereafter filed in the trial court a combined pleading consisting of a petition for writ of mandamus and a civil complaint. The petition challenged the Board's failure to issue certificates of compliance for the 25 lots shown on the Houx map and sought a writ requiring their issuance, as well as other relief. The complaint alleged a cause of action for violation of due process against the Board's vice-chairman, Valerie Brown, and a deputy county counsel, Sue Gallagher, who advised the Board in connection with the Ranch matter. The complaint asserted that the Ranch was denied notice and an opportunity to be heard with respect to the Board's decision. It further sought a declaration that subdivision maps recorded after 1893 are presumptively valid, and an injunction prohibiting the County from enforcing its policy "that requires automatic denial of certificates of compliance for maps approved by the County from 1893 to 1919 and denial on a case by case basis for those maps recorded from 1919 to 1929."

Following briefing and argument on the writ petition, the trial court issued an order concluding that the lots described in the Houx map were not covered by the grandfather clause of the Act and that there had been no violation of due process in connection with the County's consideration of the Ranch's application. The parties thereafter stipulated that the trial court's ruling on the writ petition would be dispositive of the causes of action alleged in the Ranch's civil complaint, and judgment was entered against the Ranch.

## II. DISCUSSION

The Ranch challenges both the denial of its application for certificates of compliance with respect to the Houx map lots and the trial court's conclusion

that no violation of due process occurred in connection with the denial. In general, we apply the substantial evidence standard of review to the trial court's decision on a petition for writ of mandate, but we review de novo any issues of statutory interpretation that arise. (*Fishback v. County of Ventura* (2005) 133 Cal.App.4th 896, 902 [35 Cal.Rptr.3d 199].)

A.  *The Validity of the Houx Subdivision Map*

  1.  *The Subdivision Map Act*

  ■ The Act grants to local governments the power to regulate the manner in which their communities grow. Although the Act itself contains few, if any, substantive growth regulations, it requires every landowner who wishes to divide a single parcel of land into smaller parcels for individual sale—thereby increasing the density of settlement on the land—to obtain the approval of the local government before doing so. (§§ 66424, 66426, 66428, 66499.30, subds. (a)–(c); *Lakeview Meadows Ranch v. County of Santa Clara* (1994) 27 Cal.App.4th 593, 598 [32 Cal.Rptr.2d 615].) At the same time, the Act vests "[r]egulation and control of the design and improvement of subdivisions" in city and county governing bodies, requiring them to adopt ordinances regulating the manner in which growth will occur. (§ 66411.) By requiring proposed new subdivisions to comply with these regulations as a condition of approval, local governments can ensure that new real estate development conforms to their communities' general and specific plans and other regulations adopted to guide growth. (*Gardner, supra,* 29 Cal.4th at p. 997.) Local governmental control over community growth made possible by the Act "encourage[s] and facilitate[s] orderly community development . . . and assure[s] proper improvements are made, so that the area does not become an undue burden on the taxpayer." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985 [44 Cal.Rptr.2d 93].) For that reason, the Act also prevents "fraud and exploitation of the public and purchasers." (*John Taft Corp. v. Advisory Agency* (1984) 161 Cal.App.3d 749, 755 [207 Cal.Rptr. 840].)

  ■ In practice, the Act requires every landowner proposing to subdivide property to obtain city or county approval of a "final map" or a "parcel map" of the subdivision, which must comply with the local ordinances adopted under the Act. (§§ 66452.1, 66457, 66463; *John Taft Corp. v. Advisory Agency, supra,* 161 Cal.App.3d at p. 755.) A final map is required for a subdivision of five or more parcels, while a parcel map is required for smaller subdivisions. (§§ 66424, 66426.) Section 66499.30, subdivisions (a), (b), and (c) enforces the requirement of map approval by prohibiting the sale, lease, or financing of a lot until an approved final or parcel map, as appropriate, has been recorded with respect to the lot.

Section 66499.35, subdivision (a) permits a landowner to apply for a certificate of compliance stating that a particular parcel is in compliance with the Act and the local ordinances adopted pursuant to it and that the parcel can be sold without further compliance. If the local government concludes that the property complies, the certificate must be issued. (*Id.*, subds. (a), (f)(1)(E); *Findleton v. Board of Supervisors* (1993) 12 Cal.App.4th 709, 714 [15 Cal.Rptr.2d 665].)

### 2. *The Act's Grandfather Clause*

Critical to this appeal is the Act's grandfather clause, which legalizes lots that were created under earlier versions of the Act or other predecessor legislation. Prior to 1893, California statutes did not attempt to regulate the subdivision of property. Landowners were free to subdivide and sell their real property as they saw fit. (*Gardner, supra*, 29 Cal.4th at p. 1000.) Although landowners at the time commonly created and recorded subdivision maps, the maps were used primarily to aid in the identification of lots created by subdivision. Once a subdivision map had been created, a lot's deed of sale could identify the lot by reference to the subdivision map rather than describe its location in metes and bounds. (*Id.* at pp. 1000–1001; see, e.g., *De Sepulveda v. Baugh* (1887) 74 Cal. 468, 474 [16 P. 223]; *Cadwalader v. Nash* (1887) 73 Cal. 43, 44 [14 P. 385].) The 1893 legislation, which for the first time required the recording of a subdivision map before subdivided lots could be sold, was gradually expanded until, in 1929, the first modern land use regulation was enacted. (Stats. 1893, ch. LXXX, § 4, pp. 96–97; Stats. 1929, ch. 837, p. 1790 & ch. 838, p. 1805.)

■ The Act's grandfather clause, section 66499.30, subdivision (d), specifies which subdivision maps approved and recorded pursuant to earlier legislation will be recognized as valid, despite their failure to comply with current legal requirements. As mentioned above, subdivisions (a) through (c) of section 66499.30 prohibit commercial transactions involving parcels for which no final or parcel map has been recorded. Section 66499.30, subdivision (d) creates an exception for these requirements, stating that: "Subdivisions (a), (b), and (c) do not apply to any parcel or parcels of a subdivision offered for sale or lease, contracted for sale or lease, or sold or leased in compliance with or exempt from any law (including a local ordinance), *regulating the design and improvement of subdivisions* in effect at the time the subdivision was established." (Italics added.) ■ Accordingly, if a subdivision map does not qualify as a "final map" or a "parcel map" under the Act but was recorded in compliance with statutes that regulated the design and improvement of subdivisions in effect at the time the map was recorded, the prohibitions against sale in subdivisions (a) through (c) do not apply.

### 3. *Gardner v. County of Sonoma*

There has been little judicial interpretation of the Act's grandfather clause. By far the most significant precedent is *Gardner*, in which the Supreme Court approved the County's refusal to extend section 66499.30, subdivision (d) to cover a subdivision map recorded in 1865. (*Gardner, supra*, 29 Cal.4th at p. 994.) The court began its analysis by noting that no state statute authorized the establishment of subdivided parcels before 1893; judicial decisions prior to that date "merely recognized the principle that subdivision maps could properly supply the legal description of property conveyed by deed." (*Id.* at p. 1001.) For that reason, "where an antiquated map was not recorded pursuant to any subdivision statute, ordinance, or regulation, a subdivided lot shown on that map generally enjoyed no independent legal status until the owner actually conveyed the lot separately from the surrounding lands through a deed or patent." (*Ibid.*, fn. omitted.) That is, "unlike a modern-day final map or parcel map, which upon recordation ordinarily converts what was formerly a single parcel into as many separate lots as appear on the map [citation], the recordation of a subdivision map in Sonoma County in 1865, without something more (such as a conveyance), could not and did not work a legal subdivision of the property shown thereon, and property owners who recorded subdivision maps in Sonoma County in 1865 generally remained free to deed parcels and lots as they desired without regard to the depicted subdivisions." (*Id.* at p. 1002, fn. omitted.) Because the 1865 recording of the subdivision map had no legal effect on the lots described, the court concluded, the map did not "establish" the subdivision for purposes of section 66499.30, subdivision (d). (*Gardner*, at p. 1002.)

Significantly, the court also observed that "issuing certificates of compliance based on the [1865 map] would frustrate the Act's objectives . . . . [¶] [I]f we were to adopt plaintiffs' position and hold that local agencies must issue a certificate of compliance for any parcel depicted on an accurate, antiquated subdivision map, we would, in effect, be permitting the sale, lease, and financing of parcels: (1) without regard to regulations that would otherwise require consistency with applicable general and specific plans [citations] and require consideration of potential environmental and public health consequences [citations]; (2) without consideration of dedications and impact mitigation fees that would otherwise be authorized by the Act; and (3) without affording notice and an opportunity to be heard to interested persons and landowners likely to suffer a substantial or significant deprivation of their property rights [citations]." (*Gardner, supra*, 29 Cal.4th at p. 1005, fn. omitted.) In the end, the court refused to recognize the subdivision map both "[b]ecause the provisions of the Map Act do not support such a result, and because the Act's objectives and protections would be thwarted if pre-1893 recorded maps . . . were deemed sufficient by themselves to place parcels into compliance with the Act." (*Id.* at pp. 1005–1006.) In reaching

this conclusion, the court expressly refused to consider the application of the grandfather clause to subdivision maps recorded between 1893 and 1929. (*Id.* at p. 1001, fn. 7.)

One implication of the Supreme Court's decision in *Gardner* is that the mere recordation of a subdivision map would not "establish" a subdivision for purposes of section 66499.30 if the act of recordation was not recognized as effecting a legal division of property. (See *Gardner, supra,* 29 Cal.4th at p. 1002.) This raises the possibility that the Houx map's recordation in 1915 would have been insufficient to satisfy the grandfather clause if, under the subdivision map act then in effect, recordation alone did not create a legal subdivision. It was unnecessary for *Gardner* to address the legal effect of recordation under early subdivision map acts, however, because in 1865 there was no map act at all. As the court noted in footnote 7, "Certain amici curiae in support of the County assert that only maps recorded under the 1929 predecessor to the Map Act or subsequent map statutes legally created parcels. [Citations.] Conversely, the California Attorney General has opined that maps recorded under earlier predecessor statutes to the Act should also be deemed to create parcels. [Citation.] We need not resolve that dispute in this case, for the map at issue here predates the earliest predecessor statute enacted in 1893." (*Id.* at p. 1001, fn. 7.)

The question left open in footnote 7 is potentially relevant here, but the parties have not argued this aspect of *Gardner.* Further, they have not provided us with the legal background necessary to determine whether map recordation in 1915 effected a legal subdivision.[5] Because there are other adequate grounds for decision, it is unnecessary for us to determine whether the Houx Subdivision was "established," as the term was used in *Gardner*, by the filing of the Houx map, and we do not address this issue further.[6]

### 4. *Interpreting Section 66499.30*

The Ranch contends that the Houx map, which was undisputedly recorded in compliance with subdivision map laws in effect in 1915, must be recognized under the Act's grandfather clause, section 66499.30, subdivision (d). While acknowledging that the Houx map was lawfully recorded, the County

[5] The County states in a conclusory manner that the 1929 legislation was the first to make maps binding on the landowner, but this conclusion is supported by no analysis of contemporary legal authority.

[6] The County also argues that certification of the parcels in the Houx map is precluded by section 66412.7, a problematic, later-enacted statute that purports to define "established" for purposes of section 66499.30, subdivision (d). In light of our discussion, *post*, we do not reach this argument. We also deny the County's request for judicial notice, which primarily concerns legislative history materials associated with the enactment of section 66412.7.

argues that the rudimentary subdivision map laws in effect in 1915 did not "regulat[e] the design and improvement of subdivisions," as required by subdivision (d), because they imposed few or no constraints on real estate subdivision and development. The Ranch responds that, while minimal, the 1915 statutes' regulation of development was sufficient to qualify under the grandfather clause. In addition, the Ranch argues that the legislative history of subdivision (d) demonstrates that it was intended to recognize all preexisting subdivision maps, regardless of the scope of then-existing subdivision map laws.

We begin our analysis with the Ranch's second argument, which is based on the legislative history of the grandfather clause. Because we conclude that the legislative history of the clause is not dispositive, we then proceed to an analysis of the meaning of the critical language of the clause, "regulating the design and improvement of subdivisions," and the history and substance of the subdivision map laws in effect in 1915, when the Houx map was recorded, before applying the language of section 66499.30, subdivision (d) to those statutes.

a. *Statutory Interpretation*

■ It is generally said that "[o]ur task in interpreting these statutes is 'to ascertain and effectuate legislative intent.' [Citation.]" (*Bernard v. Foley* (2006) 39 Cal.4th 794, 804 [47 Cal.Rptr.3d 248, 139 P.3d 1196].) The search for intent, however, takes a specific form. " ' "Because statutory language 'generally provide[s] the most reliable indicator' of [legislative] intent [citations], we turn to the words themselves, giving them their 'usual and ordinary meanings' and construing them in context [citation]." [Citation.] If the language contains no ambiguity, we presume the Legislature meant what it said, and the plain meaning of the statute governs. [Citation.]' " (*People v. Allegheny Casualty Co.* (2007) 41 Cal.4th 704, 708–709 [61 Cal.Rptr.3d 689, 161 P.3d 198].)

■ "To the extent this examination of the statutory language leaves uncertainty, it is appropriate to consider 'the consequences that will flow from a particular interpretation. [Citation.]' [Citation.] Where more than one statutory construction is arguably possible, our 'policy has long been to favor the construction that leads to the more reasonable result. [Citation.]' [Citation.] This policy derives largely from the presumption that the Legislature intends reasonable results consistent with its apparent purpose. [Citation.] Thus, our task is to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose, and to avoid a construction that would

lead to unreasonable, impractical, or arbitrary results. [Citations.]" *(Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291 [48 Cal.Rptr.3d 183, 141 P.3d 288].)

b. *The Statutory History of the Grandfather Clause*

The Ranch argues that the legislative history of the Act's grandfather clause demonstrates that the clause was intended to preserve the recognition of all antiquated subdivision maps, regardless of the nature of the laws regulating subdivision design and improvement at the time they were recorded. Understanding the argument requires a review of the statutory development of the grandfather clause.

Almost from the beginning, the subdivision map statutes recognized the need to protect subdivided lots created by maps recorded under earlier land use regulation. The earliest grandfather clause was introduced by amendment in 1907, only 14 years after the first subdivision map legislation. The 1907 statute granted validity not only to maps that complied with its provisions but also to any map that "was filed or recorded prior to the taking effect of this act and in accordance with the laws in force at the time it was so filed or recorded." (Stats. 1907, ch. 231, § 8, p. 292.) The same language was found in 1913 legislation. (Stats. 1913, ch. 306, § 8, pp. 570–571.)

Legislation enacted in 1929 introduced the modern concept of tentative and final maps and permitted local governments to regulate streets and roads, drainage, and other aspects of development. (Stats. 1929, ch. 837, §§ 7, 9, pp. 1794–1795; see *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 563 [6 Cal.Rptr.3d 746].) Yet that legislation contained a simple, all-encompassing grandfather provision. Recognition was granted not only to maps recorded in compliance with the 1929 legislation but also to any map that "was filed or recorded prior to the taking effect of this act." (Stats. 1929, ch. 837, § 3, p. 1792.) A substantial expansion of the 1929 act, enacted in 1937, preserved this all-encompassing grandfather clause. In detailed language, the 1937 act recognized not only maps recorded in compliance with its terms, but also maps recorded prior to 1929, maps recorded prior to the effective date of the 1937 act and in compliance with or exempt from the 1929 act, and subdivisions surveyed prior to 1937 from which sales had actually been made. (Stats. 1937, ch. 670, § 4, p. 1865.)

The 1937 grandfather clause was displaced in 1943, when the critical language from the modern grandfather clause made its appearance as Business and Professions Code former section 11538, subdivision (b). (Stats. 1943, ch. 128, § 1, p. 868.) As newly enacted in 1943, subdivision (a) of Business and Professions Code former section 11538 prohibited the sale of

lots from a subdivision until a compliant map had been recorded, but subdivision (b) stated, "Subsection (a) does not apply to any parcel or parcels of a subdivision offered for sale, contracted for sale or sold in compliance with or exempt from any law (including a local ordinance), regulating the design and improvement of subdivisions in effect at the time the subdivision was established." (Stats. 1943, ch. 128, § 1, p. 868.) The modern grandfather clause, Government Code section 66499.30, subdivision (d), is a direct descendent of Business and Professions Code former section 11538, subdivision (b), and the operative language in former section 11538—"any law . . . regulating the design and improvement of subdivisions in effect at the time the subdivision was established"—has been preserved without change in Government Code section 66499.30.

The Ranch argues that the introduction of the modern grandfather language in Business and Professions Code former section 11538 was intended merely to codify the all-encompassing language that had been a feature of the subdivision map statutes since 1907, without changing its broad scope. The argument is based less on the actual language of former section 11538 than on legislative history documents generated at the time it was enacted, which state exactly that: the legislation was intended to codify existing law, rather than to change it. For example, an open 1942 letter from the California Code Commission, which initially drafted the 1943 legislation, notes that the intent of the commission was only to codify the existing subdivision map act, rather than to revise its provisions. A memorandum from the Office of Legislative Counsel and a letter from the Attorney General, drafted when the legislation was sent for signature to Governor Earl Warren, both opined that the 1943 legislation codified the Act "without change in legal effect." Other materials reflect similar sentiments, although none of them address or explain the substantial change in the language of the grandfather clause from the earlier version.

■ Because we conclude that the plain language of the 1943 grandfather clause cannot reasonably be construed as effecting no substantive change over its predecessor statute, we cannot consider these legislative history materials. Resort to legislative history is proper only if the statutory language is ambiguous—that is, is susceptible to more than one reasonable construction. (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1055 [80 Cal.Rptr.2d 828, 968 P.2d 539].) While one can argue about the exact meaning of the grandfather clause, there is no reasonable argument that its plain meaning is identical to that of the grandfather clause of 1937, because the 1943 language plainly excludes subdivision maps that qualified under that earlier provision. The 1937 statute protected virtually every subdivision map that had been recorded before its enactment. In particular, it expressly recognized every map "recorded or filed prior to August 14, 1929." (Stats. 1937, ch. 670, § 4, p. 1865.) Such language would protect not only the

Houx map, but also the map from *Gardner*, filed in 1865, and every other map recorded in California's early history. Yet there is no debate that, at least prior to 1893, California had no legislation "regulating the design and improvement of subdivisions," as required by the 1943 language. Indeed, prior to 1893, California had no legislation regulating subdivisions or subdivision maps at all. As our Supreme Court held in *Gardner*, the language of the 1943 grandfather clause therefore excludes maps filed or recorded, at a minimum, prior to 1893.[7] Necessarily, the 1943 language represented a narrowing of the prior grandfather clause, rather than a mere rephrasing having the same substance. The construction urged by the Ranch is therefore unreasonable, and legislative history offered in support of that construction is inadmissible. (See, e.g., *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 29–30 [34 Cal.Rptr.3d 520].)[8]

Accordingly, we must disregard the legislative history proffered by the Ranch and determine the meaning of the grandfather clause on the basis of its own language, rather than the language of its predecessor clauses. We now turn to that task.

### c.  *The Meaning of the Statutory Terms*

Statutory interpretation begins with an analysis of the meaning of the statutory language. (*People v. Allegheny Casualty Co., supra*, 41 Cal.4th at pp. 708–709.) Section 66499.30, subdivision (d), as noted above, grandfathers any antiquated subdivision map that was filed "in compliance with or exempt from any law (including a local ordinance), regulating the design and improvement of subdivisions in effect at the time the subdivision was established." The issue disputed by the parties is whether, in 1915, there existed any laws that "regulat[ed] the design and improvement of subdivisions."

---

[7] The Supreme Court held, "Although the grandfather provisions of the Act reflect the Legislature's intent to protect those who detrimentally relied on prior subdivision laws in individual situations, they evince no intent to imbue antiquated maps with a legal significance that did not exist in their own time. . . . [W]e hold that antiquated subdivision maps, recorded in the absence of an applicable subdivision statute, ordinance, or regulation, did not in themselves establish subdivisions or create legal parcels that mandate the issuance of certificates of compliance for the subdivided parcels they depict." (*Gardner, supra*, 29 Cal.4th at p. 1006.)

[8] In any event, the opinions of the Legislative Analyst and Attorney General, both of which were prepared after passage of the bill, cannot be considered because they provide no evidence of the intent of the Legislature; they are merely after-the-fact legal opinions. (See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc., supra*, 133 Cal.App.4th at pp. 29–30.) Only the California Code Commission's open letter, which was presumably made available to the Legislature as a whole, is relevant and a proper subject of judicial notice. The letter cannot, however, overcome the plain language of the statute, which demonstrates that the new language made substantive changes in the scope of the grandfather clause.

■ We begin with the meaning of the critical terms, "design," "improvement," and "subdivision." The Ranch urges us to apply definitions taken from Webster's dictionary, but there are definitions closer to home, in the Act itself. The law of statutory interpretation instructs us to apply the usual and ordinary meaning of words unless a definition is provided within the statute itself. Internal definitions are controlling. (*Schnyder v. State Bd. of Equalization* (2002) 101 Cal.App.4th 538, 545 [124 Cal.Rptr.2d 571].)

The Act defines "design" as "(1) street alignments, grades and widths; (2) drainage and sanitary facilities and utilities, including alignments and grades thereof; (3) location and size of all required easements and rights-of-way; (4) fire roads and firebreaks; (5) lot size and configuration; (6) traffic access; (7) grading; (8) land to be dedicated for park or recreational purposes; and (9) other specific physical requirements in the plan and configuration of the entire subdivision that are necessary to ensure consistency with, or implementation of, the general plan or any applicable specific plan . . . ." (§ 66418.)

Similarly, "improvement" is defined in the Act as either (1) "any street work and utilities to be installed, or agreed to be installed, by the subdivider on the land to be used for public or private streets, highways, ways, and easements, as are necessary for the general use of the lot owners in the subdivision and local neighborhood traffic and drainage needs as a condition precedent to the approval and acceptance of the final map thereof" or (2) "any other specific improvements or types of improvements, the installation of which, either by the subdivider, by public agencies, by private utilities, by any other entity approved by the local agency, or by a combination thereof, is necessary to ensure consistency with, or implementation of, the general plan or any applicable specific plan." (§ 66419.)

Finally, "subdivision" is defined as "the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, . . . for the purpose of sale, lease or financing, whether immediate or future. . . ." (§ 66424.)

### d. *Subdivision Map Statutes in 1915*

The parties and amici curiae have provided us with a thorough history of the subdivision map statutes from California's earliest days. Although our interpretation of the language of section 66499.30 must rest on the statutes in effect in 1915, we agree with the parties that the historical background of the 1915 statutes provides a useful context for understanding their terms.

As noted above, the first California statute regulating subdivision maps was enacted in 1893. Entitled "[a]n Act requiring the recording of maps of cities,

towns, . . . or subdivisions of lands into small lots . . . and providing a penalty for the selling . . . any lots . . . before such maps are filed and recorded," the statute truly is a subdivision *map* act. (Stats. 1893, ch. LXXX, p. 96, italics omitted.) That is, the concern of the legislation is not with the subdivision reflected in the map but with the map itself. The statute appears to have been intended to bring order to the hitherto unregulated practice of recording subdivision maps, for it required persons who wished to subdivide their property to record "an accurate map" depicting the size and location of the lots created and the location of any property dedicated for public use within the subdivision. (Stats. 1893, ch. LXXX, §§ 1, 3, p. 96.) The 1893 act forbade the sale of lots from a subdivision until the requisite map was on file, but it did not otherwise regulate subdivision of a parcel. (Stats. 1893, ch. LXXX, § 4, pp. 96–97.)

The 1893 act evolved slowly over the course of the next few years. It was first augmented in 1901, when new legislation established slightly more detailed requirements for subdivision maps. The 1901 amendment also required that the local government be given the opportunity to accept or reject any property designated as dedicated to public use on the map prior to the map's recordation. (Stats. 1901, ch. CXXIV, § 1, p. 288.) In 1907, additional requirements were specified for the map, and landowners were prohibited from giving to the subdivision a name confusingly similar to the city in which the subdivision was to be situated. (Stats. 1907, ch. 231, §§ 1, 2, 5, pp. 290–292.)

The most substantial early changes were made in 1913. In these amendments, the Legislature required every subdivision map to be submitted to the local governing body, not merely for the acceptance of dedicated property, but "for the approval of such governing body." (Stats. 1913, ch. 306, § 4, p. 570.) In addition, the 1913 legislation granted the governing body some, if very limited, control over the subdivision design reflected in the map: "Such governing body may require the public highways, if any, offered for dedication by said map or plat and the parcel or parcels of land, if any, therein reserved or indicated for highway or right of way purposes, and not offered for dedication to public use, to be as wide as and to conform, as near as practicable, to the adjoining, surrounding or neighboring streets or highways of said city, city and county, or county." (*Ibid.*) The 1913 amendments also required, for the first time, that subdivision maps be prepared by a licensed professional. (Stats. 1913, ch. 306, § 1, p. 568.)

The final form of the statutes that governed recordation of the Houx map was determined by amendments enacted earlier in 1915, along with the first legislation authorizing city planning commissions. (Stats. 1915, ch. 756, p. 1512 & ch. 428, p. 708.) Under the 1915 amendments, if the local

jurisdiction contained one of the newly created planning commissions, the governing body was required, prior to approval of the map, to refer it to the planning commission for a report. (Stats. 1915, ch. 756, § 2, p. 1513.)[9]

e. *Application of the Statutory Language*

The Ranch first argues that the 1915 statutory requirement that the subdivision map depict and identify lots, highways, and property set aside for public dedication is sufficient to constitute regulation of the "design and improvement of subdivisions." We cannot agree. The requirement that recorded maps accurately depict various features of the subdivision constituted regulation of the drawing depicting the subdivision, rather than regulation of the subdivision's improvement and configuration. The statutes in effect in 1915 granted the local governing body no authority—with the one exception noted above—to impose constraints on these features. The statutes did not limit or otherwise regulate the number, siting, minimum size, or design of lots into which a parcel could be divided, and they did not require the installation of transportation, drainage, or sewage improvements, let alone other infrastructure or public facilities. Nor did they grant to local governments the authority to impose such requirements. Rather, it was the landowner who determined the size and configuration of the lots, the existence and location of roads and utilities, and whether to dedicate land to the public and, if so, where and how much. The mere requirement that, once the subdivider had made these decisions, they be accurately reflected in the map did not constitute regulation of the subdivision.

██   Similarly, we do not accept the Ranch's argument that the grant of authority to the local governing body to "approve" the maps constituted the regulation of design and improvement of subdivisions. The power to approve is necessarily limited by the statutory requirements against which approval is to be measured; approval authority is not an independent grant of discretionary power. In 1915, the local governing body was limited to ensuring that the map was accurate, was prepared by a licensed professional, and otherwise complied with statutory requirements. While it is true that, as the Ranch argues, later court decisions held that local governments could regulate aspects of real estate development not expressly mentioned in governing statutes (e.g., *Ayres v. City Council of Los Angeles* (1949) 34 Cal.2d 31, 35–37 [207 P.2d 1]), there is no evidence that this type of discretionary authority was exercised, or even recognized, in 1915. Further, section 66499.30, subdivision (d) refers only to compliance with "any law (including a local ordinance)" regulating development, not with the exercise of uncodified discretionary authority.

---

[9] Since the new legislation authorized planning commissions only in cities, this presumably had no impact on the Houx map. (Stats. 1915, ch. 428, § 1, p. 708.)

As noted above, there is one exception to the generalization that the 1915 statutes regulated the map, rather than the subdivision. The 1913 amendments granted to the local governments the authority to require the subdivider to make all public and private roads "as wide as and to conform, as near as practicable, to the adjoining" streets (Stats. 1913, ch. 306, § 4, p. 570), and this authority was preserved in the 1915 statutes. (Stats. 1915, ch. 756, § 2, p. 1513.) While there is no question that this provision constitutes more than regulation of the map, we conclude that it is insufficient to satisfy subdivision (d) of section 66499.30 for two reasons.

First, this provision did not regulate subdivision "improvement," as that term is defined in the Act. Section 66419 defines "improvement" as infrastructure "to be installed, or agreed to be installed, by the subdivider on the land . . . as a condition precedent to the approval and acceptance of the final map thereof" or "any other specific improvements . . . the installation of which . . . is necessary to ensure consistency with, or implementation of, the general plan or any applicable specific plan." In other words, "improvement" is infrastructure that the subdivider is required to install in order to secure legal authority to subdivide the property. The 1915 legislation required no commitment by the subdivider to install any type of infrastructure. The subdivider was presumably expected, and perhaps required, to deed to the public any land designated in the map for public dedication, but the statutes did not require the landowner to build anything on that land. Further, the statutes did not even mention infrastructure other than roads, let alone require the installation of such infrastructure. Because subdivision (d) of section 66499.30 requires regulation of both design *and* improvement, this is sufficient to disqualify the statutes regulating the Houx map from qualifying under section 66499.30.

Further, although it is a closer question, we conclude that the 1915 statutes also failed to regulate the "design" of subdivisions, as the term is defined in section 66418. It is true that the statutes did regulate one aspect of subdivision design, the location and width of roads. As even a glance at section 66418 reveals, however, the "design" of subdivisions entails a far broader scope of activities: lot size and configuration, lot drainage, sewage and other utility installation, grading, recreational lands, and other public facilities. Most important among these, the 1915 statutes omitted any regulation of the primary characteristic of a subdivision—the division of a large parcel into smaller usable lots. In a very literal sense, the provision did not regulate "subdivision" at all. Given the broad definition of "design" in section 66418,

the regulation of the single feature of road location and width is simply insufficient to qualify as regulation of the "design" of "subdivisions" under section 66499.30.[10]

Our conclusion in this regard is supported by the second rationale of *Gardner*, the public policy underlying modern subdivision regulation. Similar to the 1865 map in *Gardner*, the Houx map is a planning anachronism, merely a grid laid across a parcel of land. There is no indication that any consideration was given to the appropriate siting of residences, lot drainage, the feasibility and construction of utility service, or any of the many other issues that arise when development occurs. It is difficult to imagine a plan for real estate development more at odds with modern subdivision regulation. Certifying the Houx map would, as *Gardner* noted, authorize development "(1) without regard to regulations that would otherwise require consistency with applicable general and specific plans [citations] and require consideration of potential environmental and public health consequences [citations]; (2) without consideration of dedications and impact mitigation fees that would otherwise be authorized by the Act; and (3) without affording notice and an opportunity to be heard to interested persons and landowners likely to suffer a substantial or significant deprivation of their property rights [citations]." (*Gardner, supra*, 29 Cal.4th at p. 1005, fn. omitted.) Because we are counseled to consider " 'the consequences that will flow from a particular interpretation' " when construing a statute, we cannot disregard the obvious clash between the Houx map and the objectives of the modern Act. (*Copley Press, Inc. v. Superior Court, supra*, 39 Cal.4th at p. 1291.)[11]

Finally, we note that our interpretation of section 66499.30 works no unfairness on the Ranch and its owners. As noted in *Hays v. Vanek* (1989) 217 Cal.App.3d 271 at pages 289–290 [266 Cal.Rptr. 856], "[t]he clear purpose of

---

[10] In making its argument, the Ranch relies on a 1991 opinion of the Attorney General that considered the issuance of certificates of compliance for lots described in a 1914 subdivision map. (74 Ops.Cal.Atty.Gen. 149 (1991).) While the Attorney General did conclude that the certificates of compliance must be issued, its conclusion was based on section 66412.6, rather than section 66499.30. (74 Ops.Cal.Atty.Gen., *supra*, at p. 152.) The version of section 66412.6 then in effect was subsequently amended to limit its application to subdivisions creating fewer than five parcels. (Stats. 1993, ch. 500, § 2, p. 2620; see § 66412.6, subd. (a).) The reasoning of the Attorney General in the 1991 opinion is therefore no longer applicable to a large subdivision, such as the Houx Subdivision.

[11] Responding to the County's expression of concern for public policy, the Ranch argues that "[a]ny conflict between the composition of the 1915 Houx Map . . . and the County's policies is the County's problem, not [the Ranch's]." In fact, local regulation of real estate development is intended to protect surrounding landowners, potential buyers of subdivided lots, and members of the public generally. The Houx map's noncompliance therefore would create a "problem" not merely for the County government but for all its individual residents, including the owners of the Ranch.

the so-called 'grandfather' clause is to protect developers who have detrimentally relied on an earlier state of the law. That purpose is hardly served by allowing later purchasers of property which has never been sold in subdivided form to take advantage of an exemption. In such cases, the later purchaser placed no reliance on the prior state of the law. On the other hand, the salutary purposes served by the Subdivision Map Act would be frustrated if a simple staking out and selling of a handful of parcels in the late 1920's could exempt all land in the subdivision 60 years and several owners later from any subdivision regulatory requirements." The Houx map was filed before the family that owns the Ranch even acquired the property, and the family has made no attempt to take advantage of the map in their 70-odd years of ownership.

■■■ Because we conclude that the regulatory statutes in effect in 1915 did not regulate the "design and improvement of subdivisions," as required by section 66499.30, subdivision (d), we agree with the Board that the Ranch's 1915 subdivision map cannot be recognized as a valid subdivision map under current law and affirm the decision of the trial court upholding the Board's ruling.

## B.  *Due Process*

The Ranch also argues that, for three principal reasons, it was denied due process during the County's consideration of its application for certificates of compliance with respect to the Houx map lots: (1) that the Board's policy of refusing to recognize all maps recorded prior to 1919 constituted a "de facto land use ordinance" that was enacted without following proper legislative procedures, (2) the Board's conclusion that the Houx map was inconsistent with modern County land use regulation was based on matters outside the hearing record, and (3) the conduct of a deputy county counsel in advising the Board was improper.

The parties do not discuss the proper standard of review with respect to these causes of action, which were alleged in the civil complaint but resolved by the parties' stipulation that the trial court's order on the writ petition would be applied to the causes of action in the complaint. We apply the substantial evidence test appropriate in reviewing a writ petition ruling (*Fishback v. County of Ventura, supra*, 133 Cal.App.4th at p. 902), but we

would not reach a different conclusion if we applied the independent judgment standard applicable to, for example, a motion for summary judgment. (E.g., *Doe v. Salesian Society* (2008) 159 Cal.App.4th 474, 478 [71 Cal.Rptr.3d 565].)[12]

### 1. *Enactment of a De Facto Land Use Ordinance*

The Ranch first contends that the Board's articulation of a general policy for handling post-1893 subdivision maps in connection with the earlier appeals constituted the enactment of a "de facto land use ordinance" without following proper legislative procedures.[13] In making this argument, the Ranch cites not a single authority to support its contentions that a policy of statutory interpretation articulated in the course of deciding the appeal of an administrative decision constitutes a "de facto" ordinance and that "de facto" ordinances are subject to the same rule-making requirements as "real" ordinances.

Although the Board is a legislative body, that is not its only role. "There are three general types of actions that local government agencies take in land use matters: legislative, adjudicative and ministerial. [Citations.] Legislative actions involve the enactment of general laws, standards or policies, such as general plans or zoning ordinances. [Citation.] Adjudicative actions—sometimes called quasi-judicial, quasi-adjudicative or administrative actions—involve discretionary decisions in which legislative laws are applied to specific development projects; examples include approvals for zoning permits and tentative subdivision maps. [Citation.] Ministerial actions involve nondiscretionary decisions based only on fixed and objective standards, not subjective judgment; an example is the issuance of a typical, small-scale building permit. [Citations.]" (*Calvert v. County of Yuba* (2006) 145 Cal.App.4th 613, 622 [51 Cal.Rptr.3d 797].)

Issuance of a certificate of compliance under section 66499.35, subdivision (a) is a ministerial act, requiring the responsible local agency to determine whether a valid final or parcel map has been recorded or, if not, what must be done to complete the process. Unlike, for example, the actual approval of a subdivision map, consideration of an application for a certificate of compliance does not require "the exercise of judgment, and the

---

[12] Causes of action in a civil complaint, if resolved prior to trial, would ordinarily be resolved by demurrer, judgment on the pleadings, or summary judgment. As to these causes of action, the motion for a writ of mandate functioned like a motion for summary judgment, since there appears to be little or no dispute over the facts underlying the Ranch's due process claims.

[13] The Ranch also argues that the Board was without power to adopt a policy contrary to state statute. Because we have concluded that the Board's policy, as applied to the Houx map, was a correct interpretation of state law, the premise of this argument fails.

careful balancing of conflicting interests" (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 615 [156 Cal.Rptr. 718, 596 P.2d 1134]); rather, issuance of certificates of compliance normally involves " ' "merely appl[ying] the law to the facts . . . us[ing] no special discretion or judgment in reaching a decision." ' " (*Calvert v. County of Yuba, supra,* 145 Cal.App.4th at p. 624, quoting *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 117 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) Certainly that was true in this case, in which issuance was strictly a matter of applying section 66499.30 to undisputed facts. In considering an appeal of the PRMD denial, the Board was engaging in a ministerial, not a legislative, act.

Further, in stating a policy to govern future similar appeals, the Board was not establishing a "general standard," in the manner of a legislative body. The general standard applied by the Board had been established long before by the Legislature when it enacted section 66499.30. In stating its policy, the Board was merely interpreting that existing general standard, as it was required to do to carry out its ministerial duty. (See, e.g., *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1081 [17 Cal.Rptr.3d 225, 95 P.3d 459] [agency's authority to interpret statute when acting in ministerial role does not include authority to disregard statute as unconstitutional].) Local governing bodies acting in a ministerial role inevitably are called upon to make interpretive decisions that will have import for future applicants who are similarly situated. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 4–5 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha Corp.*).) Formalizing this statutory interpretation in the form of a policy did not convert that interpretation into legislation or convert a ministerial action into a legislative one. Rather, by creating a policy from its interpretation, the Board was acting responsibly to give direction to the PRMD for handling future applications, ensuring that similar applications would be handled consistently. The policy remained an act of ministerial statutory interpretation, rather than legislation.[14]

The Ranch places primary reliance on *Galland v. City of Clovis* (2001) 24 Cal.4th 1003 [103 Cal.Rptr.2d 711, 16 P.3d 130]. Other than being an action for damages under title 42 United States Code section 1983, *Galland*, a rent control case, has no relevance to the substance of the Ranch's claim that "de facto" ordinances are subject to normal legislative procedures. In its reply

_____

[14] It is clear that the Ranch's contention that the County was required to follow rule-making procedures in resolving this appeal would impose unnecessary and unworkable constraints on the County in its consideration of ministerial decisions. In effect, the PRMD would be required to determine which ministerial decisions might have an impact on future applicants, to announce those topics publicly, and to conduct a public hearing on the proper interpretation of the statutory mandate governing the appeal before resolving it. There is no such requirement. The due process rights of subsequent applicants with respect to issues of legal interpretation are protected by the mandate process.

brief, the Ranch discusses *Yamaha Corp.*, which involves the State Board of Equalization's "annotations"—published interpretations—of the state tax code. *Yamaha Corp.* contains no suggestion that the Board of Equalization was required to engage in rule-making before publishing the annotations, which arise from commentary on individual taxpayer requests. (*Yamaha Corp., supra*, 19 Cal.4th at p. 4.) Finally, the Ranch cites *Horn v. County of Ventura, supra*, 24 Cal.3d 605, which requires a local government to provide notice to adjoining landowners prior to the holding of an *adjudicatory* hearing on matters affecting their land. (*Id.* at p. 616.) Because the Ranch's claim here is that the County engaged in a legislative action, *Horn* would provide limited support under the best of circumstances. The case is simply irrelevant, since, for the reasons discussed above, this was a ministerial, not an adjudicatory hearing.[15]

### 2. *Ex Parte Communications*

The Ranch next contends that the Board must have considered ex parte communications in ruling on its appeal. The Ranch bases this speculation on the Board's conclusion in its resolution that approval of the Ranch's application could undermine the County's land use regulation because the certificates might conflict with land use designations, acreage limitations, and the preservation of water supplies and scenic landscapes, issues that were not discussed during the public hearing on the matter.[16]

We find no substantial evidence to support the inference that improper conduct occurred. The issue of the consistency of an antiquated subdivision map with modern land use regulations was raised in *Gardner, supra*, 29 Cal.4th at page 1005, and that inconsistency was one of two grounds for the court's decision. (*Id.* at pp. 1005–1006.) Because the *Gardner* case was discussed extensively by the Ranch in its written submission to the Board in connection with the appeal, the Ranch was demonstrably on notice that the Board was required to consider the issue of consistency with current law in making its ruling. The Ranch was provided a full opportunity at the hearing to address that issue. If the issue was not raised at the hearing, it was a failure of the Ranch, not the Board. This forewarning distinguishes our situation

---

[15] The Ranch has filed a motion to supplement the record on appeal with a memorandum prepared by the PRMD in connection with the Board's policy. Because we find the memorandum irrelevant to the issues raised in this appeal, we hereby deny the motion.

[16] The Ranch also contends that its due process rights were violated because it was told in a July 6, 2005 letter that the Board would consider the County's administrative decision to award five certificates at a meeting on July 12, 2005, but the minutes of the July 12 meeting reflect no such consideration. Regardless of events on July 12, it is clear that the Ranch was given a hearing on its appeal, including a public hearing in front of the Board on January 31, 2006. We therefore find no basis to conclude that the Ranch was deprived of due process by the Board's action, or failure to act, on July 12, 2005.

fully from *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152 [56 Cal.Rptr.2d 223], in which the grounds for the city's decision were raised for the first time only after the public hearing had closed, at a time when the petitioners no longer had an opportunity to address them. (*Id.* at p. 1173.)

Further, the statements that the Ranch speculates originated in "ex parte communications" are actually matters that can be deduced from information in the record about the nature of the Houx map and from knowledge of the County's existing land use regulation. The Board's conclusion that the two are in conflict was less a factual than a legal conclusion. There is no substantial evidence to support the claim that the Ranch was deprived of due process by this aspect of the Board's ruling.

### 3. *Bias*

The Ranch also contends that it was denied due process because Susan Gallagher, a deputy county counsel, "performed the incompatible dual roles of an advocate *and* advisor to the decision maker" by advising both PRMD and the Board on legal issues surrounding compliance with section 66499.30, and assisting in formulating the Board's policy that maps recorded before 1919 would be rejected, those recorded between 1919 and 1929 would be reviewed, and those recorded after 1929 would be accepted.

The contention is based on *Howitt v. Superior Court* (1992) 3 Cal.App.4th 1575 [5 Cal.Rptr.2d 196] (*Howitt*) and *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81 [133 Cal.Rptr.2d 234] (*Nightlife Partners*), in which both courts found a possible deprivation of due process when public attorneys represented the local government in a contested matter and, at the same time or subsequently, advised a decision maker in the matter. In *Howitt*, the decision maker was a quasi-independent commission established to resolve county employment disputes. During a contested evidentiary hearing over a complaint against the sheriff's department by an employee, an attorney from the county counsel's office represented the sheriff's department, while a second attorney from that office advised the commission. (*Howitt*, at p. 1578.) The court concluded that county counsel could not undertake this dual representation, in which the office was both advocate and adviser to the decision maker in a contested hearing, unless adequate internal safeguards were established to avoid a conflict of interest. (*Id.* at pp. 1579, 1587.) Although the court found that the situation did not pose a traditional ethical conflict for the county counsel's office, it concluded, "By definition, an advocate is a partisan for a particular client or point of view. The role is inconsistent with true objectivity, a constitutionally necessary characteristic of an adjudicator." (*Id.* at pp. 1580, 1585.)

In *Nightlife Partners*, an attorney from the city attorney's office was engaged in representing the city in federal litigation brought by the plaintiff "cabaret" to challenge the city's adult entertainment regulations. When the plaintiff sought to renew its adult entertainment permit, the same attorney represented the administrative agency, corresponding with the plaintiff regarding the renewal process. Once the permit had been denied and an appeal filed, however, that attorney acted as an adviser to the appeal hearing officer, consulting actively with the hearing officer throughout an evidentiary hearing at which the city was represented by a different attorney. (*Nightlife Partners, supra,* 108 Cal.App.4th at pp. 84–85.) Again, the court concluded that when a public attorney acts as advocate in a matter, the attorney is generally precluded by due process concerns from advising the decision maker in the same matter. (*Id.* at p. 92.)

Neither case is applicable here because there is no evidence that Gallagher ever acted as an advocate in connection with the Ranch's proceeding. While Gallagher's exact role is unclear, we assume for the sake of argument that she was the attorney from the county counsel's office who was charged with advising both PRMD and the Board with respect to the interpretation of section 66499.30, in connection with the earlier appeals, and therefore was instrumental in devising the policy followed by the Board.[17] Such a role did not place Gallagher in the role of advocate adverse to the Ranch. There is no evidence Gallagher represented the County in related preexisting litigation against the Ranch or communicated with the Ranch while acting as the County's attorney, as counsel in *Nightlife Partners* did, nor that she represented PRMD before the Board, as counsel in *Howitt* did. At the Board hearing over the Ranch's certificates, PRMD was represented by a staff member. Gallagher's role was limited to providing, at the request of a Board member, a public "primer on *Gardner* and how it applies to this particular situation." All of Gallagher's activities vis-à-vis the Ranch are therefore consistent with those of a legal adviser to the Board.[18] The mere fact that she reached her conclusions and provided advice to PRMD and the Board prior to the hearing of the Ranch's appeal did not convert her from an adviser to an advocate, nor did it demonstrate bias, either on her part or the part of the Board. (See, e.g., *BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1241 [97 Cal.Rptr.2d 467].)

---

[17] The evidence cited by the Ranch regarding Gallagher's role demonstrates that Gallagher wrote a letter to the Sonoma County Planning Commission in connection with the appeals heard in 2005, in response to a request for legal analysis from the commission. Gallagher also gave advice to PRMD staff, the planning commission, and the Board "on legal issues raised in connection with applications for certificates of compliance under Government Code §66499.35."

[18] We note that Sue A. Gallagher is listed as counsel of record for the County on this appeal. Gallagher's indisputable role as an advocate for the County on this appeal does not retroactively deprive the Ranch of due process in connection with the administrative proceedings.

## III.  DISPOSITION

The judgment of the trial court is affirmed.

Marchiano, P. J., and Swager, J., concurred.

A petition for a rehearing was denied August 26, 2008, and appellant's petition for review by the Supreme Court was denied October 28, 2008, S166578.