[No. A121817. First Dist., Div. Five. Apr. 17, 2009.]

ABERNATHY VALLEY, INC., Plaintiffs and Respondents, v.
COUNTY OF SOLANO, Defendant and Appellant.

COUNSEL

Dennis Bunting, County Counsel, and James W. Laughlin, Assistant County Counsel, for Defendant and Appellant.

Stoel Rives, James P. Corn, Barbara A. Brenner and Allison D. Cook for Plaintiff and Respondent.

OPINION

STEVENS, J.*—Abernathy Valley, Inc., is the current owner of land that is shown on a subdivision map recorded in 1909 pursuant to a 1907 statewide subdivision map law. Abernathy asked the County of Solano (County) to record a certificate of compliance with the Subdivision Map Act, Government Code section 66410 et seq., for one lot on the property. The County denied the application and Abernathy petitioned for a writ of mandate to compel the County to issue the certificate. The trial court granted the writ, ruling that the lot was grandfathered under Government Code section 66499.30, subdivision (d). We consider whether parcels depicted on the 1909 map are entitled to legal recognition under the Subdivision Map Act's grandfather clause. We reverse.

BACKGROUND

In 1909, the "Wm. Pierce Subdivision No. 1" map (Pierce Map) was filed with the Solano County Recorder. The map depicted a parcel of about 250 acres of land subdivided into 25 lots of about 10 acres each, with each lot identified by number. In a deed recorded in 2002, Abernathy Valley, Inc. (Abernathy), acquired lots 9 through 16 and lots 19 through 24 (which collectively comprised a single contiguous area of land), with the exception of parts of lots 20 and 21, which had previously been conveyed.

Abernathy applied for a certificate of compliance in accordance with Government Code section 66499.35 for "Lot 12 as shown on the [Pierce Map]" (Lot 12) on August 27, 2003.[1] The Office of County Counsel, on behalf of the Solano County Department of Environmental Management

---

*Retired Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] "Any person owning real property . . . may request, and a local agency shall determine, whether the real property complies with the provisions of this division [the Subdivision Map Act, Gov. Code, tit. 7, div. 2] and of local ordinances enacted pursuant to this division. If a local agency determines that the real property complies, the city or the county shall cause a certificate of compliance to be filed for record with the recorder of the county in which the real

(Department), informed Abernathy by letter that the application could not be granted. According to county counsel, the Pierce Map did not fully comply with the laws in effect in 1909 so as to qualify for the grandfather provision of section 66499.30, subdivision (d),[2] and Abernathy had not produced evidence that Lot 12 had ever been separately conveyed. The Department referred the application to the planning commission since it could not determine that the lot was clearly in compliance with subdivision map regulations. In March 2006, the planning commission voted to issue a certificate of compliance. The Solano County Board of Supervisors (Board) reviewed the commission's decision de novo and voted to deny the certificate, instructing county staff "to only approve those maps filed after the 1929 Map Act."

Abernathy and Raymond Ferrari, a shareholder of Abernathy (hereafter collectively, Abernathy), filed a petition for writ of mandate seeking the issuance of an unconditional certificate of compliance. (Code Civ. Proc., § 1094.5.) In granting the writ, the trial court concluded the Pierce Map was grandfathered under the Subdivision Map Act since it complied with the 1907 subdivision map law in effect at the time it was filed and recorded and the 1907 law "regulat[ed] the design and improvement of subdivisions" within the meaning of the grandfather provision (§ 66499.30, subd. (d)).

### DISCUSSION

"[A] local agency's decision to deny certificates of compliance is reviewable by petition for writ of administrative mandate. [Citation.] The question for the trial court and for us on appeal is the same: whether the local agency's decision is supported by substantial evidence. [Citation.] The burden is on appellant to show there is no substantial evidence to support the decision. [Citation.]" (*Fishback v. County of Ventura* (2005) 133 Cal.App.4th 896, 901–902 [35 Cal.Rptr.3d 199] (*Fishback*).) However, here as in *Fishback*, "there is little or no dispute about the evidence. Instead, the focus of the dispute is on the meaning of statutes. Statutory construction is a question of law which requires the exercise of our independent judgment." (*Id.* at p. 902.)

We first address the issue of whether the parcels depicted on the Pierce Map are protected by the grandfather provision of the Subdivision Map Act.

property is located." (Gov. Code, § 66499.35, subd. (a).) All future statutory references are to the Government Code unless otherwise indicated.

[2] "Subdivisions (a), (b), and (c) [which prohibit the sale, lease or financing of parcels that do not comply with the Subdivision Map Act] do not apply to any parcel or parcels of a subdivision offered for sale or lease, contracted for sale or lease, or sold or leased in compliance with or exempt from any law (including a local ordinance), regulating the design and improvement of subdivisions in effect at the time the subdivision was established." (§ 66499.30, subd. (d).)

Next, we will address Abernathy's argument that applying the current act to those parcels would be an impermissible retrospective application of law. Then we will consider Abernathy's argument that the County did not have the power to deny its application for a certificate of compliance, but had to choose one of only two statutory options: granting an unconditional certificate of compliance or granting a conditional certificate of compliance.

## I. Grandfather Provision

The regulation of real property subdivision and development in California has evolved significantly over the last 150 years. In the late 19th century, the California Supreme Court affirmed the practice of relying on external documents, including subdivision maps, to provide property descriptions in deeds and other instruments of conveyance. (*De Sepulveda v. Baugh* (1887) 74 Cal. 468, 473–474 [16 P. 223].) In 1893, the state Legislature adopted the first statewide act designed to regulate subdivision map drafting to ensure the maps' accuracy and completeness. (Stats. 1893, ch. LXXX, pp. 96–97.) The act was amended in 1901 to somewhat tighten the drafting requirements and to give local governments the opportunity to accept or reject property that was shown on a subdivision map as dedicated to public use. (Stats. 1901, ch. CXXIV, § 1, pp. 288–289.) In 1907, the drafting standards for the maps were again strengthened. (Stats. 1907, ch. 231, pp. 290–292.) This was the state of the law when the Pierce Map was recorded.

Beginning in 1913 and continuing through 1943, the Legislature increasingly authorized local governments to exert substantive control over the division of property, rather than simply regulating the content and accuracy of subdivision maps. Legislation enacted in 1913 authorized local governments to withhold approval of maps unless public highways shown on the maps conformed as nearly as practicable to adjoining streets and highways. (Stats. 1913, ch. 306, § 4, p. 570.) Additional substantive review requirements were added in 1919 and 1921. (Stats. 1919, ch. 349, § 1, pp. 725–726 [requiring assessor and surveyor or engineer to assess residential or commercial value of lots and report to the governing body]; Stats. 1921, ch. 592, § 1, pp. 1002–1003 [if natural waterway crossed map, allowing governing body to condition approval on dedication of easement or conveyance of right of way for storm drainage purposes].) Meanwhile, in 1915, the Legislature enacted the first legislation authorizing city planning commissions (Stats. 1915, ch. 428, § 1, p. 708) and amended the subdivision map act to require subdivision maps to be referred to planning commissions before approval where the local jurisdiction had established a commission (Stats. 1915, ch. 756, § 2, p. 1513). In 1917, the Legislature authorized cities to adopt zoning ordinances. (Stats. 1917, ch. 734, p. 1419.) Ten years later, the Legislature adopted the first modern planning law, which expressly

authorized planning commissions to regulate subdivisions. (Stats. 1927, ch. 874, § 15, p. 1905.) In 1929, the planning law was updated (Stats. 1929, ch. 838, p. 1805) and the Legislature adopted the first modern subdivision law (Stats. 1929, ch. 837, pp. 1790–1791). The subdivision law was further updated in 1937, 1943 and thereafter. (See, e.g., Stats. 1937, ch. 670, p. 1863; Stats. 1943, ch. 128, p. 865.)

■ The current version of the law is the Subdivision Map Act, section 66410 et seq. (the Act). Under the Act, subdivisions ordinarily "may be lawfully accomplished only by obtaining local approval and recordation of a tentative and final map pursuant to section 66426, when five or more parcels are involved, or a parcel map pursuant to section 66428 when four or fewer parcels are involved. [Citation.] A local agency will approve a tentative and final map or a parcel map only after extensive review of the proposed subdivision and consideration of such matters as the property's suitability for development, the adequacy of roads, sewer, drainage, and other services, the preservation of agricultural lands and sensitive natural resources, and dedication issues. (See, e.g., §§ 66451–66451.7, 66452–66452.13, 66453–66472.1, 66473–66474.10, 66475–66478.)" (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 997 [129 Cal.Rptr.2d 869, 62 P.3d 103] (*Gardner*).) The Act prohibits the sale, lease, financing or improvement of any parcel or parcels of real property for which a final map or parcel map is required under the Act unless a final map or parcel map has been recorded. (§ 66499.30, subds. (a)–(c).)

Since 1907, each subdivision map act adopted by the Legislature has included a grandfather provision that exempts maps from current legal requirements if they were filed or recorded before the effective date of the current law and if they complied with the laws in effect at the time they were filed or recorded. (See Stats. 1907, ch. 231, § 8, p. 292; Stats. 1913, ch. 306, § 6, pp. 570–571; Stats. 1915, ch. 756, p. 1512 [amending existing law with no change to grandfather provision]; Stats. 1919, ch. 349, p. 725 [same]; Stats. 1921, ch. 592, p. 1002 [same]; Stats. 1929, ch. 837, § 1, p. 1791.) In 1937, the language of the grandfather provision was modified (Stats. 1937, ch. 670, § 4, p. 1865), and in 1943 it was substantially rewritten to match the language of the current grandfather provision (Stats. 1943, ch. 128, § 1, pp. 865, 868 [adding Bus. & Prof. Code, former § 11538, subd. (b)]; § 66499.30, subd. (d)).

The central question before us is whether the 1909 Pierce Map is covered by the current grandfather provision, which provides that the prohibitions on selling, leasing, or financing parcels on maps that do not comply with the Act do not apply to "any parcel or parcels of a subdivision offered for sale or lease, contracted for sale or lease, or sold or leased in compliance with or

exempt from any law (including a local ordinance), *regulating the design and improvement of subdivisions* in effect at the time the subdivision was *established.*" (§ 66499.30, subd. (d), italics added; see *Gardner, supra,* 29 Cal.4th at p. 998.)

*Gardner,* the leading case interpreting the current grandfather provision, stands for the proposition that maps recorded before the effective date of the first statewide map legislation (which was enacted in 1893), and that were not subject to other local statutes or regulations governing the subdivision of property at the time they were recorded, are not entitled to the protection of the grandfather provision. (*Gardner, supra,* 29 Cal.4th at pp. 1001, 1002–1003.) Specifically, the court held that the recording of a map before 1893 did not "establish" the subdivision depicted on the map within the meaning of the grandfather provision. (*Id.* at pp. 1000–1001 [discussing § 66499.30, subd. (d); § 66412.7]; see also *Gardner,* at pp. 1003–1004 [recordation before 1893 also did not "create" subdivision within meaning of § 66451.10, subd. (a)]; *Gardner,* at p. 1006.) *Gardner* left open the question of whether maps recorded under statewide subdivision map laws in effect between 1893 and 1929 legally created or "established" subdivision parcels when recorded and thus were covered by the grandfather provision. (*Gardner,* at p. 1001, fn. 7.)

On July 29, 2008, after the trial court issued its decision in this case, another division of our court ruled that maps filed in compliance with subdivision map laws in effect in 1915 are not covered by the grandfather provision, an issue that was not resolved in *Gardner, supra,* 29 Cal.4th 990. (*Witt Home Ranch, Inc. v. County of Sonoma* (2008) 165 Cal.App.4th 543, 548 [81 Cal.Rptr.3d 123] (*Witt*).) Rather than determine whether the parcels were "established" within the meaning of the grandfather provision, the *Witt* court examined whether the statewide subdivision map law in effect in 1915 was a law "regulating the design and improvement of subdivisions" within the meaning of the grandfather provision. (See *id.* at pp. 554, 564.)

*Witt* reviewed the substantive controls over subdivisions that were in place by 1915: "The most substantial early changes were made in 1913. In these amendments, the Legislature required every subdivision map to be submitted to the local governing body, not merely for the acceptance of dedicated property, but 'for the approval of such governing body.' (Stats. 1913, ch. 306, § 4, p. 570.) In addition, the 1913 legislation granted the governing body some, if very limited, control over the subdivision design reflected in the map: 'Such governing body may require the public highways, if any, offered for dedication by said map or plat and the parcel or parcels of land, if any, therein reserved or indicated for highway or right of way purposes, and not offered for dedication to public use, to be as wide as and to conform, as near

as practicable, to the adjoining, surrounding or neighboring streets or highways of said city, city and county, or county.' (*Ibid.*) . . . [¶] . . . Under the 1915 amendments, if the local jurisdiction contained one of the newly created planning commissions, the governing body was required, prior to approval of the map, to refer it to the planning commission for a report. (Stats. 1915, ch. 756, § 2, p. 1513.)" (*Witt, supra,* 165 Cal.App.4th at pp. 560–561.)

The *Witt* court then considered whether the law in effect in 1915 was a law "regulating the design and improvement of subdivisions" pursuant to the current grandfather provision. (*Witt, supra,* 165 Cal.App.4th at p. 561.) The court observed that "design" is specifically defined in the Act to mean "(1) street alignments, grades and widths; (2) drainage and sanitary facilities and utilities, including alignments and grades thereof; (3) location and size of all required easements and rights-of-way; (4) fire roads and firebreaks; (5) lot size and configuration; (6) traffic access; (7) grading; (8) land to be dedicated for park or recreational purposes; and (9) other specific physical requirements in the plan and configuration of the entire subdivision that are necessary to ensure consistency with, or implementation of, the general plan or any applicable specific plan as required pursuant to Section 66473.5." (§ 66418; see *Witt,* at p. 559.) The Act defines "improvement" to mean "(a) . . . any street work and utilities to be installed, or agreed to be installed, by the subdivider on the land to be used for public or private streets, highways, ways, and easements, as are necessary for the general use of the lot owners in the subdivision and local neighborhood traffic and drainage needs as a condition precedent to the approval and acceptance of the final map thereof[;] [¶] [and] (b) . . . any other specific improvements or types of improvements, the installation of which, either by the subdivider, by public agencies, by private utilities, by any other entity approved by the local agency, or by a combination thereof, is necessary to ensure consistency with, or implementation of, the general plan or any applicable specific plan." (§ 66419; see *Witt,* at p. 559.)

The laws in effect in 1915 contained none of the foregoing language. They regulated the map rather than the subdivision, with the sole exception that they authorized local governments "to require the subdivider to make all public and private roads 'as wide as and to conform, as near as practicable, to the adjoining' streets (Stats. 1913, ch. 306, § 4, p. 570) . . . . (Stats. 1915, ch. 756, § 2, p. 1513.)" (*Witt, supra,* 165 Cal.App.4th at p. 562.) The court concluded these laws did not purport to regulate the "improvement" of the subdivision and thus they did not regulate the "design *and* improvement" of subdivisions within the meaning of the grandfather clause. (*Ibid.*) Nor did such laws regulate the "design" of subdivisions since they "omitted any regulation of the primary characteristic of a subdivision—the division of a large parcel into smaller usable lots." (*Ibid.*) The 25-acre lot map at issue in *Witt,* for example, was "a planning anachronism, merely a grid laid across a

parcel of land. There is no indication that any consideration was given to the appropriate siting of residences, lot drainage, the feasibility and construction of utility service, or any of the many other issues that arise when development occurs. It is difficult to imagine a plan for real estate development more at odds with modern subdivision regulation." (*Id.* at p. 563.) To permit maps recorded in compliance with these laws to be grandfathered under the current Act would seriously undermine the objectives of the Act. (*Witt,* at p. 563.)

The *Witt* court's analysis applies with even more force to maps recorded in compliance with the 1907 statewide subdivision map law (the law in effect at the time the Pierce Map was recorded in 1909). The 1907 act did not even grant local agencies the authority to require highways to conform to adjoining streets as did the 1913 and 1915 versions of the law. (*Witt, supra,* 165 Cal.App.4th at pp. 560; Stats. 1907, ch. 231, §§ 1, 2, 5, pp. 290–292.) Abernathy perfunctorily argues that a *1901* provision requiring local governments to accept dedications for public use, which was still in effect in 1907 (Stats. 1907, ch. 231, § 4, p. 291),[3] was a law "regulating the design and improvement of subdivisions." However, this provision did not regulate subdivision "improvement" and the grandfather provision refers to laws that regulate design *and* improvement. (§ 66499.30, subd. (d).) Moreover, it is questionable whether the mere acceptance or rejection of a dedication of a highway for public use falls within the Act's definition of "design," as the provision does not permit the agency to change the alignment, grade, width, or location of the highway. (See § 66418.) In any event, the provision is not a sufficient regulation of design to come within the meaning of the grandfather provision for the reasons stated in *Witt*: it omits "any regulation of the primary characteristic of a subdivision—the division of a large parcel into smaller useable lots." (*Witt, supra,* 165 Cal.App.4th at p. 562.)

Following *Witt*'s historical analysis, we conclude that, even assuming Lot 12 was "established" when the Pierce Map was recorded in 1909, its filing and recordation was not "in compliance with or exempt from any law . . . regulating the *design and improvement* of subdivisions in effect at the time." (§ 66499.30, subd. (d), italics added.) The 1907 statewide law was not such a law and Abernathy has not attempted to show that the map complied with or was exempt from any other law, such as a local ordinance, in effect at the time.

---

[3] The provision states that "if the [map or plat] offers for dedication any highway, or portion thereof," it must be presented to the "governing body having control of public highways in the territory shown on such map or plat, and said governing body shall endorse thereon which of the public highways offered by said map or plat they accept on behalf of the public . . . ." (Stats. 1907, ch. 231, § 4, p. 291.)

Abernathy argues that, beginning in 1907, the Legislature has demonstrated a consistent intent to "grandfather earlier-created lots or parcels provided they were created in compliance with the law in effect at the time" without qualification and that the current grandfather clause should be construed that broadly. However, as we have already observed, the grandfather provision was substantially rewritten in 1943 to include the language of the current grandfather provision. (See also *Witt, supra,* 165 Cal.App.4th at pp. 556–557.) *Witt* rejected the argument that the modern grandfather language "was intended merely to codify the all-encompassing language that had been a feature of the subdivision map statutes since 1907, without changing its broad scope," which is essentially Abernathy's argument in this appeal. (*Witt, supra,* 165 Cal.App.4th at p. 557.) We agree with *Witt* that "the plain language of the [modern] grandfather clause cannot reasonably be construed as effecting no substantive change . . . ." (*Ibid.*) "The 1937 statute protected virtually every subdivision map that had been recorded before its enactment. In particular, it expressly recognized every map 'recorded or filed prior to August 14, 1929.' (Stats. 1937, ch. 670, § 4, p. 1865.) Such language would protect not only [a map recorded in 1915], but also the map from *Gardner*[, *supra*, 29 Cal.4th 990], filed in 1865, and every other map recorded in California's early history. Yet there is no debate that, at least prior to 1893, California had no legislation 'regulating the design and improvement of subdivisions,' as required by the 1943 language. Indeed, prior to 1893, California had no legislation regulating subdivisions or subdivision maps at all. As our Supreme Court held in *Gardner*, the language of the 1943 grandfather clause therefore excludes maps filed or recorded, at a minimum, prior to 1893. Necessarily, the 1943 language represented a narrowing of the prior grandfather clause, rather than a mere rephrasing having the same substance." (*Witt*, at pp. 557–558, fn. omitted.)

Abernathy also maintains that the grandfather provision must be harmonized with two other sections of the Act, which it claims establish the validity of the Pierce Map. Section 66468 reads, "The filing for record of a final or parcel map by the county recorder shall automatically and finally determine the validity of such map and when recorded shall impart constructive notice thereof." Section 66499.35, subdivision (d) provides, "A recorded final map, parcel map, official map, or an approved certificate of exception shall constitute a certificate of compliance with respect to the parcels of real property described therein." Although Abernathy acknowledges that the Pierce Map is not a "final map," or "parcel map" as those terms are defined in the Act (see §§ 66433–66443, 66444–66450, 66451–66451.7, 66456–66462.5), it nevertheless argues that reliance on the current definitions "elevates form over substance" and that "the early provisions of the law requiring the filing of subdivision maps should be given effect, even though they do not bear the label 'final' or 'parcel' . . . ." Abernathy does not and

cannot cite to any language in the 1907 law providing that recordation under that law automatically and finally determined the validity of a map. (Stats. 1907, ch. 231, p. 290.) Abernathy's attempt to stretch current statutory provisions into a generalized principle reaching backward in time is unpersuasive.

Lot 12 is not protected by the grandfather provision.[4]

## II. *Retroactivity*

Abernathy next contends that the Act will have an impermissibly retroactive effect unless Lot 12 of the Pierce Map comes within the grandfather provision. We are not persuaded.

■ "A basic canon of statutory interpretation is that statutes do not operate retrospectively unless the Legislature plainly intended them to do so. (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1207–1208 [246 Cal.Rptr. 629, 753 P.2d 585]; *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 393 [182 P.2d 159].) A statute has retrospective effect when it substantially changes the legal consequences of past events. (*Kizer* v. *Hanna* (1989) 48 Cal.3d 1, 7 [255 Cal.Rptr. 412, 767 P.2d 679].) A statute does not operate retrospectively simply because its application depends on facts or conditions existing before its enactment. (*Ibid.*) Of course, when the Legislature clearly intends a statute to operate retrospectively, we are obliged to carry out that intent unless due process considerations prevent us. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587, 592 [128 Cal.Rptr. 427, 546 P.2d 1371].)" (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 [62 Cal.Rptr.2d 243, 933 P.2d 507].)

In order for the Act to operate retrospectively as to the Pierce Map, Abernathy must demonstrate that some prior act (occurring before the effective date of the statutory provision at issue) had legal consequences that would be substantially changed by the application of current law. Abernathy's argument, although far from clear, appears to be that the recording of the Pierce Map gave rise to an indefinite right to subdivide the property along the lines depicted on the map: "it is legally improper to retroactively determine that [the Pierce Map] and the parcels that were depicted [thereon] could not be sold, leased, or financed after the turn of the 21st century without further Subdivision Map Act compliance . . . [because] [f]or almost a full century

---

[4] Because we conclude, following *Witt, supra,* 165 Cal.App.4th 543, that the 1907 statute in effect when the Pierce Map was recorded in 1909 was not a law "regulating the design and improvement of subdivisions" within the meaning of the grandfather provision, we need not address the County's argument that Lot 12 was not "established" as a separate parcel upon recordation of the Pierce Map within the meaning of the grandfather provision.

since recordation of the 1909 Map, property owners [and others] have relied upon the validity of the parcels described and depicted on [the map]."

As mentioned, *ante*, the 1907 law did not specify that the recording of a map in compliance with its provisions would finally determine the validity of the subdivisions depicted on the map. Rather, the law simply permitted the owner of the property to sell, offer for sale or lease a lot or parcel of land by reference to the recorded map. (Stats. 1907, ch. 231, § 8, p. 292.)[5] By way of comparison, the court in *Gardner* observed with respect to maps recorded before 1893: "unlike a modern-day final map or parcel map, which upon recordation ordinarily converts what was formerly a single parcel into as many separate lots as appear on the map [citation], the recordation of a subdivision map in Sonoma County in 1865, without something more (such as a conveyance), could not and did not work a legal subdivision of the property shown thereon . . . ." (*Gardner, supra,* 29 Cal.4th at p. 1002.) The map could facilitate conveyances by providing a legal description of property that was conveyed by deed, but "could not alter the legal status of those properties without the attendant conveyances." (*Ibid.,* fn. omitted.) The County cites case law that appears to rely upon background facts supporting the proposition that maps recorded under the 1907 statute likewise did not legally subdivide the property upon recordation and that land owners remained free to convey portions of the property that did not correspond to the subdivision lines on the map. (See *Bryant v. Blevins* (1994) 9 Cal.4th 47, 50–51 [36 Cal.Rptr.2d 86, 884 P.2d 1034] [64-lot map was recorded in 1910 and one-half of one lot contemporaneously conveyed]; *In re Dixon* (1932) 120 Cal.App. 635, 636 [8 P.2d 881] [map recorded in or before 1919 and two portions of lot 67 were conveyed in 1919 and 1920, with another portion retained]; *Home etc. Assn. v. Western etc. Co.* (1904) 145 Cal. 217, 218 [78 P. 626] [plat recorded in 1899 and one-half of one lot conveyed sometime before 1904].)

Abernathy has not shown that the legal status of Lot 12 was ever altered by way of a conveyance. Although it points out that a portion of the property depicted on the Pierce Map that *includes* Lot 12 has been conveyed since the Pierce Map was recorded, Abernathy offers no evidence that Lot 12 was ever separately conveyed as an individual parcel.[6] Abernathy does *not* seek a certificate of compliance for the entire parcel that was conveyed from the

---

[5] "No person shall sell or offer for sale any lot or parcel of land, by reference to any map or plat, unless such map or plat has been made, certified, endorsed, acknowledged and filed in all respects as provided in this act . . . ." (Stats. 1907, ch. 231, § 8, p. 292.)

[6] In connection with this argument, Abernathy asks us to take judicial notice of various deeds, judgments and indentures evidencing the conveyance history of Lot 12 and the property of which it is a part. The request is denied. Abernathy cites the documents for the truth of the facts stated therein (i.e., as evidence of actual conveyances of the property, not as evidence of the existence of records on file in court), which is not a proper subject of judicial notice.

property shown on the Pierce Map. Notably, the Department indicated that it would issue a certificate for that parcel or parcels if certain underlying factual assumptions were confirmed.[7] The only issue presented in this argument is whether the refusal to issue a certificate of compliance for *Lot 12* based solely on its depiction on the 1909 Pierce Map is a retrospective application of law.[8] Abernathy has not established this proposition because it has not demonstrated that the recording of the Pierce Map or a later conveyance altered the legal status of the property and that application of the current law would change that legal status.

█ In any event, even if we assumed that application of current law to Abernathy's property would operate retrospectively, Abernathy has not even attempted to demonstrate that such a retrospective operation of law would violate its due process rights. "In determining whether a retroactive law contravenes the due process clause, we consider such factors as the significance of the state interest served by the law, the importance of the retroactive application of the law to the effectuation of that interest, the extent of reliance upon the former law, the legitimacy of that reliance, the extent of actions taken on the basis of that reliance, and the extent to which the retroactive application of the new law would disrupt those actions." (*In re Marriage of Bouquet, supra,* 16 Cal.3d at p. 592.) The state interests served by the Act are " 'to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer.' [Citations.]" (*Gardner, supra,* 29 Cal.4th at p. 1005.)

---

(*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73], overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1262 [63 Cal.Rptr.3d 418, 163 P.3d 106].) Moreover, the documents were not included in either the administrative or the trial court record. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 565 [38 Cal.Rptr.2d 139, 888 P.2d 1268] [courts generally do not consider evidence not contained in the trial court record on questions of fact and in administrative mandamus actions do not consider evidence that was not contained in the administrative record].) In any event, the documents do not demonstrate that Lot 12 was ever separately conveyed.

[7] The county counsel's initial response to Abernathy's application stated, "In order to simplify our analysis of your application, we will assume that the recent conveyance from Ferrari Brothers to Abernathy Valley complied with the Subdivision Map Act, and that the 2002 grand deed's description of the property as two parcels reflects prior conveyances that also complied with the Act. If these two assumptions are in fact correct, we would advise the Department to issue a Certificate of Compliance recognizing that the single parcel of property described as Lots 9 through 16, inclusive, as shown on the 1909 Pierce map complies with the applicable provisions of the Subdivision Map Act and related Solano County ordinances."

[8] At oral argument, county counsel represented that the County would have issued a certificate of compliance for Lot 12 if Lot 12 had ever been separately conveyed after recordation of the Pierce Map.

▮ Applying principles similar to those set forth in *In re Marriage of Bouquet, supra,* 16 Cal.3d at page 592, *Witt* concluded that applying current law to property that was depicted on a map recorded in 1915 "works no unfairness on the [property owners]. As noted in *Hays v. Vanek* (1989) 217 Cal.App.3d 271 at pages 289–290 [266 Cal.Rptr. 856], '[t]he clear purpose of the so-called "grandfather" clause is to protect developers who have detrimentally relied on an earlier state of the law. That purpose is hardly served by allowing later purchasers of property which has never been sold in subdivided form to take advantage of an exemption. In such cases, the later purchaser placed no reliance on the prior state of the law. On the other hand, the salutary purposes served by the Subdivision Map Act would be frustrated if a simple staking out and selling of a handful of parcels in the late 1920's could exempt all land in the subdivision 60 years and several owners later from any subdivision regulatory requirements.' " (*Witt, supra,* 165 Cal.App.4th at pp. 563–564.) Given the importance of the Act's objectives as described in *Gardner* and minimal reliance placed upon the 1909 Pierce Map by Abernathy, we conclude no due process violation exists. (See also *Gardner, supra,* 29 Cal.4th at pp. 1005–1006.)

### III. *Denial of Application for Certificate of Compliance*

Abernathy also claims the County had only two alternatives when presented with its application for a certificate of compliance pursuant to section 66499.35, subdivision (d): either grant an unconditional certificate of compliance or grant a conditional certificate of compliance. According to Abernathy, denying its application was not permitted by the statute. The County argues for a construction of the statute that would permit a local agency to deny an application for only a portion of the applicant's property if the issuance of the certificate of compliance would effectively subdivide the property.

▮ " '[O]ur task in interpreting . . . statutes is "to ascertain and effectuate legislative intent." [Citation.]' [Citation.] . . . ' " '. . . [W]e turn to the words themselves, giving them their "usual and ordinary meanings" and construing them in context [citation].' [Citation.] . . ." ' " (*Witt, supra,* 165 Cal.App.4th at p. 555.) " 'To the extent this examination of the statutory language leaves uncertainty, . . . our task is to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary results. [Citations.]' [Citation.]" (*Id.* at pp. 555–556.)

▮ Abernathy's argument relies on the plain language of the statute: "(a) Any person owning real property or a vendee of that person pursuant to a contract of sale of the real property may request, and a local agency shall

determine, whether the real property complies with the provisions of this division and of local ordinances enacted pursuant to this division. *If a local agency determines that the real property complies, the city or the county shall cause a certificate of compliance to be filed* for record with the recorder of the county in which the real property is located. The certificate of compliance shall identify the real property and shall state that the division of the real property complies with applicable provisions of this division and of local ordinances enacted pursuant to this division. The local agency may impose a reasonable fee to cover the cost of issuing and recording the certificate of compliance. [¶] (b) *If a local agency determines that the real property does not comply with the provisions of this division or of local ordinances enacted pursuant to this division, it shall issue a conditional certificate of compliance.* A local agency may, as a condition to granting a conditional certificate of compliance, impose any conditions that would have been applicable to the division of the property at the time the applicant acquired his or her interest therein . . . ." (§ 64499.35, subds. (a), (b), italics added.) "Shall" is ordinarily construed as mandatory (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610]), and the statute appears to give the local agency only two options: issue an unconditional certificate if the property complies or a conditional certificate if it does not. (See *Hunt v. County of Shasta* (1990) 225 Cal.App.3d 432, 438, fn. 3 [275 Cal.Rptr. 113] [in dicta, stating an agency "must file either a certificate or a conditional certificate in all cases"].)

On the other hand, the statute includes language that an unconditional certificate of compliance "shall state that *the division of the real property* complies with applicable provisions of this division and of local ordinances enacted pursuant to this division" (§ 66499.35, subd. (a), italics added), and that a conditional certificate may "impose any conditions that would have been applicable to *the division of the property* at the time the applicant acquired his or her interest therein . . ." (§ 66499.35, subd. (b), italics added). An alternative interpretation of the italicized language suggests that an application for a certificate of compliance may seek a determination of whether real property may be subdivided as proposed, but not a determination of whether a particular subdivision lot (which the applicant does not propose to subdivide further) complies with the Act. If this construction is correct, the statute does not require an agency to grant either an unconditional or conditional certificate for a particular subdivision lot. An application submitted for such a purpose could be rejected or denied.

In light of the ambiguity in the statutory language, we consider which party's proposed construction of the statute best comports with the purposes and overall scheme of the Act. (See *Witt, supra*, 165 Cal.App.4th at pp. 555–556.) We conclude the County's construction meets this test. If an application for a certificate of compliance could be submitted for only one

particular lot of a proposed subdivision and the local agency was required to issue either an unconditional or conditional certificate of compliance for that lot, section 66499.35 would effectively permit the subdivision of property without compliance with the Act. In this case, for instance, if the County were required to issue a conditional certificate of compliance for Lot 12 rather than deny the application, Abernathy would be able to sell, lease or finance Lot 12 without further compliance with the Act; only the development of the parcel would be prohibited until the conditions were fulfilled. (See § 66499.35, subd. (b) ["Compliance with these conditions shall not be required until the time that a permit or other grant of approval for development of the property is issued by the local agency."]; *id.*, subd. (f)(1)(E) [requiring certificates to include notice stating in part, "The parcel described herein may be sold, leased, or financed without further compliance with the Subdivision Map Act or any local ordinance enacted pursuant thereto. Development of the parcel may require issuance of a permit or permits, or other grant or grants of approval."]; *Gardner, supra,* 29 Cal.4th at p. 1005.) Such a result would "frustrate the Act's objectives 'to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer.' [Citations.]" (*Gardner,* at p. 1005.)

██ Our Supreme Court and Courts of Appeal have upheld denials of applications for certificates of compliance under such circumstances,[9] albeit without expressly addressing the question of whether such an application may be "denied" under the statutory scheme. (See *Gardner, supra,* 29 Cal.4th at pp. 995–996, 1006; *Witt, supra,* 165 Cal.App.4th at pp. 549–550, 564; *Kirk v. County of San Luis Obispo, supra,* 156 Cal.App.3d at pp. 456–458; see also *Stell v. Jay Hales Development Co.* (1992) 11 Cal.App.4th 1214, 1227 [15 Cal.Rptr.2d 220] ["A local agency has authority under [§ 66499.35] to grant or deny such an application for a certificate of compliance."], disapproved on other grounds in *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 359 [47 Cal.Rptr.2d 898, 906 P.2d 1314].) We conclude that a local agency may deny an application for a certificate of compliance that seeks a determination that a particular subdivision lot on the applicant's property complies with the Act, where the effect of issuing a certificate would be to effectively subdivide the property without complying with the Act.

---

[9] These decisions affirm denials of petitions for writs of mandate that sought orders directing the agencies to set aside their denials of applications for certificates of compliance and compelling them to issue the certificates. (See *Gardner, supra,* 29 Cal.4th at pp. 995–996, 1006; *Witt, supra,* 165 Cal.App.4th at pp. 550, 564; *Kirk v. County of San Luis Obispo* (1984) 156 Cal.App.3d 453, 457–458 [202 Cal.Rptr. 606].)

## DISPOSITION

We reverse the judgment of the trial court and direct that the petition for a writ of mandate be denied. The County of Solano is entitled to costs on appeal.

Jones, P. J., and Needham, J., concurred.