Filed 10/27/23

# CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| YES IN MY BACK YARD et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY OF CULVER CITY et al., <br><br> Defendants and Appellants. | B321477 consolidated with B325606 (Los Angeles County Super. Ct. No. 20STCV43253) |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Mary H. Strobel, Judge. Affirmed.

Aleshire & Wynder, June S. Ailin and Pam K. Lee for Defendants and Appellants.

Patterson & O'Neill, Ryan J. Patterson and Brian O'Neill for Plaintiffs and Respondents.

———————————————

The Housing Crisis Act of 2019 (the Act), codified at Government Code section 66300 et seq.,[1] is among the measures that the California Legislature has adopted to address the state's housing shortage. Subdivision (b)(1)(A) of section 66300 prohibits affected cities from (1) enacting any policy that changes the zoning of parcels to "a less intensive use" or (2) "reducing the intensity of land use" within a zoning district to below what was allowed under zoning ordinances in effect on January 1, 2018. In July 2020, defendants City of Culver City and the City Council of the City of Culver City (City Council) (collectively, the City) adopted Ordinance No. 2020-010 (the Ordinance), which amended the City's zoning code, changing development standards in its single-family residential, or R-1, zone. Among other changes, the Ordinance reduced the allowable floor area ratio (FAR) for primary residences from .60 to .45, decreasing the square footage of a house that could be built on a lot. Plaintiffs Yes In My Back Yard and Sonja Trauss (Trauss) (collectively, YIMBY) filed a petition for writ of mandate seeking an order declaring the Ordinance void. Following a hearing on the petition, the trial court determined the Ordinance violated section 66300 because the FAR reduction impermissibly reduced the intensity of land use. We affirm the judgment.

Additionally, the City appeals from a post-judgment order awarding YIMBY attorney fees pursuant to Code of Civil Procedure section 1021.5. The City contends that even if the judgment is affirmed, the fee award was not warranted because it is questionable whether the judgment benefits a significant segment of the public. Further, the City asserts the court

---

[1] All undesignated statutory references are to the Government Code.

2

considered improper factors in applying a multiplier to the lodestar amount.  We disagree and affirm the fee award.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.    The City's Study on Residential Development Standards**

In July 2017, the City retained John Kaliski Architects (JKA) to study how to address community concerns regarding "mansionization" in its R-1 neighborhoods.  Based on input from residents, JKA recommended amendments to the City's R-1 development standards that would reduce the square footage of a house that could be built on a lot.  This included changing the FAR from .60 to .45 for lots of less than 10,000 square feet and to .35 for lots of 10,000 square feet or more.  In developing its draft recommendations, JKA defined FAR as ratio of floor area to total lot area.

A joint study session with the City Council and Planning Commission took place in May 2019, where JKA's survey findings were presented, which included the opinion that "[h]ouses that maximize the existing zoning envelope and allowable [FAR] are consistently disliked across all neighborhoods."  It was noted that the draft recommendations' goal was to "[p]romote neighborhood compatibility by maintaining the existing character and scale of Culver City's single-family residential neighborhoods."  The staff report for the joint study session also noted that the City Council and Planning Commission needed to consider how accessory structures, such as additional dwelling units (ADUs), contributed to lot coverage and FAR.

3

**B.    The City Council Votes to Reduce FAR to .45**

In January 2020, City staff presented revised recommendations from JKA to the City's Planning Commission for amendments to R-1 development standards.  The recommendations included reducing the FAR in R-1 zoned neighborhoods from .60 to .45 for all lot sizes.  The City staff report for the meeting stated, "The intent of the proposed FAR reduction [was] to reduce bulk and mass of new structures as a part of overall allowable square footage."  After noting that state laws removed local governments' ability to count ADUs' square footage towards allowable FAR, the staff report indicated the "original intent of the recommended FAR [was undermined]," so although a FAR reduction of .50 had previously been discussed, City staff was recommending a FAR reduction to .45.  In other words, the recommendation was to reduce FAR from .50 to .45 to account for the fact that ADUs could not be included in calculating FAR.  The City's Planning Commission, however, recommended FAR be reduced to .50, instead of the staff's proposed .45.

The City Council held a public hearing on the Planning Commission's recommendation in May 2020 and introduced the Ordinance.  The Draft of the Ordinance read, "The proposed Zoning Code Amendment is intended to reduce incompatible mass and bulk of new single-family housing [in] Culver City. . . . The existing Zoning Code language allows for single-family home [ ] construction that does not fit existing neighborhood character. The proposed Zoning Code Amendment will modify single[-]family residential zone standards to regulate buildings that are more compatible with existing surroundings."  The City's Planning Manager explained that "[t]he driving force behind [the

4

proposed changes was] residents' concerns of the size and scale of new construction."

While addressing whether the FAR should be reduced to .50 or .45, one Councilmember explained that the difference between a .50 and .45 FAR is about 250 to 270 square feet, which the Councilmember described as "one extra bedroom." Another Councilmember said that the change from .50 to .45 had to do with "the fact that ADUs will not count towards FAR," so some ground was lost "in terms of the original goals of the mansionization ordinance." The City Council decided to set the FAR at .45 and to adopt the other changes recommended by the Planning Commission.

## C.     YIMBY Comments on the Ordinance

After the Ordinance was introduced, YIMBY submitted a letter commenting on it. YIMBY expressed "that the recently approved reduction in [FAR] and setback modifications, . . . before the City Council on the consent calendar, violate[d] the Housing Crisis Act of 2019 (Gov Code § 66300)." Among other things, the letter asserted, "[T]he reduction in permitted [FAR] from .60 to .45 would clearly reduce the intensity of residential use in the affected zones." YIMBY further communicated, "Lower FAR and excessive setbacks result in smaller homes with fewer bedrooms, limit options for ADU placement, and disincentivize development."

At a City Council meeting in June 2020, adoption of the Ordinance was postponed to allow City staff time to consult with the California Department of Housing and Community Development (the Department of Housing) and to contact Trauss. The City's Planning Manager emailed the Department of

5

Housing, seeking guidance about how the Act affected the Ordinance. In response, the Department of Housing wrote that the Act "ta[lk]s about intensity of uses," and that the Ordinance could impact the number of bedrooms that could be built, which "might trigger the less intensive use provision." The Department of Housing did not take a formal position on whether the Ordinance violated the Act.

### D.     The Ordinance is Adopted

The City Council voted unanimously to approve the Ordinance in July 2020. The staff report for the City Council meeting claimed that the Ordinance was consistent with the Act since it facilitated construction of ADUs and Junior ADUs (JADUs), did not reduce the number of units that could be built on a lot, and did not decrease the total square footage allowed on a lot.

### E.     Petition for Writ of Mandate

After the Ordinance was adopted, YIMBY filed a petition for writ of mandate, prohibition, or other extraordinary relief; complaint for declaratory relief; and request for immediate stay against the City. YIMBY alleged that the City violated section 66300's "explicit prohibition against 'reducing the intensity of land use' by enacting an ordinance that reduces '[FAR],'" and that the Ordinance resulted in a reduction of up to three million square feet of residential capacity within the City. The petition sought an order directing the City to refrain from enforcing the Ordinance and declaring it void.

The trial court held a hearing on the petition for writ of mandate and ruled that the Ordinance violated section 66300.

The court found that the Act was clear and unambiguous and generally prohibited reductions in FAR. The court rejected the City's argument that the Act applied only to changes that lower density, finding that the statutory language demonstrated the Legislature intended for section 66300 to cast a wide net to prohibit any standard that could lessen the intensity of housing. In addition, the court found the Ordinance did, in fact, reduce FAR within the City, and that YIMBY proved that the pre-Ordinance .60 FAR did not preclude development of ADUs or JADUs in the R-1 zone, which the City did not rebut. Judgment was entered in YIMBY's favor, and the court issued a peremptory writ of mandate ordering the City to repeal the Ordinance in its entirety.[2]

## F.     Attorney Fees

Following post-judgment briefing, YIMBY was awarded $131,813.58 in attorney fees pursuant to the private attorney general fee statute, Code of Civil Procedure section 1021.5. This was based on a lodestar amount of $90,405 for work performed on the merits of the case, $9,310 for work on the motion for attorney fees, and $9,497.33 for work performed after the filing of the motion. The court applied a 1.25 multiplier to the lodestar only for the work performed on the merits (($90,405 x 1.25) + $9,310 + $9,497.33). The City timely appealed from the judgment and the order awarding fees. We consolidated the appeals.

---

[2]     YIMBY's petition also included a declaratory relief cause of action. After the hearing on the petition, YIMBY informed the court it would not pursue the declaratory relief claim because the parties agreed the writ of mandate adequately addressed YIMBY's claims.

**DISCUSSION**

## A. The Writ of Mandate

### 1. *Standard of Review*

A zoning ordinance is a legislative act that is reviewable by writ of mandate. (*Arnel Dev. Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511, 521; see also *Jolicoeur v. Mihaly* (1971) 5 Cal.3d 565, 570, fn. 2 [noting that mandamus is appropriate for challenging the validity of statutes or official acts].) In a traditional mandamus proceeding (Code Civ. Proc., § 1085), "'our review is limited to a determination of whether the agency's decision was arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair. [Citation.] Independent review is required, however, where the issue involves statutory or regulatory construction, such as whether the agency's action was consistent with applicable law. [Citation.]'" (*Protect Our Neighborhoods v. City of Palm Springs* (2022) 73 Cal.App.5th 667, 676; see also *California Charter Schools Assn. v. City of Huntington Park* (2019) 35 Cal.App.5th 362, 369 ["Under Code of Civil Procedure section 1085, when the relevant facts are undisputed, and the issue is one of statutory interpretation, the question is one of law for which we employ our independent review"].)

### 2. *The Ordinance Violates Section 66300's Plain Language*

The City asserts that section 66300 is ambiguous, such that we must look at legislative materials to ascertain the Legislature's objective. YIMBY, however, argues that the Act's plain language prohibits reductions in FAR, unless a stated exception is satisfied. We agree with YIMBY.

8

"The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the statute." (*Law Office of Carlos R. Perez v. Whittier Union High School District* (2023) 87 Cal.App.5th 463, 472.)  We begin with the statutory language because it is generally the most reliable indicator of legislative intent.  (*City of Alhambra v. County of Los Angeles* (2012) 55 Cal.4th 707, 718–719 (*City of Alhambra*); *DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 378 (*DeNike*).)  "The law of statutory interpretation instructs us to apply the usual and ordinary meaning of words unless a definition is provided within the statute itself.  Internal definitions are controlling." (*Witt Home Ranch, Inc. v. County of Sonoma* (2008) 165 Cal.App.4th 543, 559 (*Witt Home Ranch*).  "If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs." (*DeNike*, *supra*, 76 Cal.App.5th at p. 378; see also *City of Alhambra*, *supra*, 55 Cal.4th at p. 719 ["'We consider extrinsic aids, such as legislative history, only if the statutory language is reasonably subject to multiple interpretations'"].)

In response to California's housing crisis, the Legislature adopted the Act, effective January 1, 2020.  (Stats. 2019, ch. 654, § 13 (Sen. Bill No. 330).)  The Legislature declared that the housing crisis was harming families in numerous ways, including increasing poverty and homelessness, driving families out of the state, and forcing lower-income residents into crowded and unsafe housing.  (*Ibid.*)

As originally enacted in 2020, section 66300, subdivision (b)(1)(A), of the Act precluded an affected city from enacting a development policy, standard, or condition that had

9

the effect of "[c]hanging the general plan land use designation, specific plan land use designation, or zoning of a parcel or parcels of property to a less intensive use or reducing the intensity of land use within an existing general plan land use designation, specific plan land use designation, or zoning district in effect at the time of the proposed change, below what was allowed under the land use designation and zoning ordinances of the affected county or affected city, as applicable, as in effect on January 1, 2018." The Act also defined what a "less intensive use" was: "For purposes of this subparagraph, 'less intensive use' includes, but is not limited to, reductions to height, density, or floor area ratio, new or increased open space or lot size requirements, or new or increased setback requirements, minimum frontage requirements, or maximum lot coverage limitations, or anything that would lessen the intensity of housing." (Stats. 2019, ch. 654, § 13 (Sen. Bill No. 330).)

As amended in 2022, subdivision (b)(1)(A) prohibits an affected city[3] from enacting a development policy, standard, or condition that has the effect of "[c]hanging the general plan land use designation, specific plan land use designation, or zoning of a parcel or parcels of property to a less intensive use or reducing the intensity of land use within an existing general plan land use designation, specific plan land use designation, or zoning district *in effect at the time of the proposed change*, below what was allowed under the land use designation *or* zoning ordinances of the affected county or affected city, as applicable, as in effect on

---

[3] The City does not dispute that it is an "affected city" as defined by section 66300, subdivision (a)(1)(A). Further, there is no dispute that the Ordinance amends the City's zoning code , and thus, is a "[d]evelopment policy, standard, or condition" as defined by section 66300. (§ 66300, subd. (a)(5)(C).)

10

January 1, 2018." (Italics added to highlight changes.) The amendment clarified that "'*reducing the intensity of land use'* includes, but is not limited to, reductions to height, density, or floor area ratio, new or increased open space or lot size requirements, new or increased setback requirements, minimum frontage requirements, or maximum lot coverage limitations, or *any other action that would individually or cumulatively reduce the site's residential development capacity*." (Italics added to highlight changes.)[4]

Accordingly, in enacting the Act, the Legislature declared that a "'less intensive use' includes . . . reductions to height, density, *or floor area ratio . . .* or anything that would lessen the intensity of housing." (Stats. 2019, ch. 654, § 13 (Sen. Bill No. 330), italics added.) As amended, section 66300, subdivision (b)(1)(A), almost identically defines "'reducing the intensity of land use'" as including "reductions to height, density, *or floor area ratio . . .* or any other action that would individually or cumulatively reduce the site's residential development capacity." (Italics added.) The use of the disjunctive "or" reflects

---

[4]    The parties refer to both versions of the statute. As amended in 2022, the Legislature added subdivision (k) to the statute, which states, "The amendments to subparagraph (A) of paragraph (1) of subdivision (b), . . . do not constitute a change in, but are declaratory of, existing law." Where statutory amendments merely clarify, rather than change, existing law, "it is not improperly retroactive to apply it to transactions predating its enactment because the true meaning of the statute remains unchanged." (*Tran v. County of Los Angeles* (2022) 74 Cal.App.5th 154, 164; see also *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922 ["A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment"].) Our interpretation of the statute is consistent under both versions. Unless otherwise stated, we cite to the current version for ease of reference.

a legislative intent that a single event, including a reduction in FAR, standing alone, constitutes an act "reducing the intensity of land use." (*Kray Cabling Co. v. County of Contra Costa* (1995) 39 Cal.App.4th 1588, 1593 ["The ordinary, familiar meaning of 'or' is a delineation of alternatives"].) The City does not dispute that the Ordinance reduced the allowed FAR for single-family residences in the R-1 zone to below what was permitted under the City's zoning ordinance in effect on January 1, 2018.

The City cites extensively to a general-purpose dictionary and a specialized dictionary focused on land use planning to argue the terms "density" and "intensity," as used in the Act, are ambiguous. The City claims that the Legislature intended that only a zoning change that reduces density, meaning the number of housing units, violates section 66300; it therefore remains free to enact zoning changes that reduce the capacity of dwellings to house people. However, there is no need to look at how other sources define "density" and "intensity," as the statutory definition for "reducing the intensity of land use" found in the Act itself is controlling. (*Witt Home Ranch, supra*, 165 Cal.App.4th at p. 559; *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 84.) "Courts accord great weight to statutory definitions because they presume such definitions accurately reflect legislative intent. A statute itself furnishes the best evidence of its own meaning, and if an act's intent can be ascertained clearly from its own provisions, that intent prevails and courts do not resort to other aids for construction. A legislature, best knowing its own intent, which defines the meaning of a word, not only exercises its legislative power, but does so with the explicit goal to provide a correct understanding of its intention, and thus to facilitate the primary judicial inquiry

12

of statutory interpretation." (Singer, 2A Sutherland Statutes and Statutory Construction (7th ed. 2022) § 47:7, fn. omitted.)

Further, the Legislature employed both terms, "intensity" and "density," in subdivision (b)(1)(A) ("'reducing the *intensity* of land use' includes, but is not limited to, reductions to height, *density*, or floor area ratio . . . " (italics added)). Had the Legislature intended for subdivision (b)(1)(A) to apply only to zoning changes that lower density, it could have used the term "density" alone. To interpret subdivision (b)(1)(A) in the manner suggested by the City—so that only a reduction in density constitutes a less intensive use—would require us to effectively write language out of the statute. We would need to conclude that the Act places no restrictions on a city's ability to enact standards that reduce height or FAR, or increase open space and setback requirements, even though it plainly says otherwise. (See *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 13 ["Because defendants' construction renders the phrase 'wholly without . . . effect,' adopting it would be inconsistent with the well-established principle that courts should, if possible, give meaning to every word of a statute and avoid constructions that make any word surplusage"].)

The City's argument that subdivision (b)(1)(A)'s catchall provision ("or any other action that would individually or cumulatively reduce the site's residential development capacity") creates an ambiguity is unpersuasive. First, the catchall provision does not abrogate the express provision stating reductions in FAR are included in the Act's definition of "reducing the intensity of land use." Second, the use of the phrase, "or any other action" after listing prohibited changes indicates that each of the listed actions, including reductions to

13

FAR, is an act that reduces a lot's residential development capacity. (See *International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 342 [explaining that where a statute lists a series of specific categories followed by a catchall category, the catchall is "'"restricted to those things that are similar to those which are enumerated specifically"'"].)

Subdivision (b)(1)(A)'s express prohibition of reducing the intensity of land by reducing FAR is to be "broadly construed so as to maximize the development of *housing* within this state." (§ 66300, subd. (f)(2), italics added.) There is no language suggesting that a reduction in the intensity of land use requires a reduction in the number of housing units, and we will not insert such a requirement into the Act. (*Bay Area Citizens v. Association of Bay Area Governments* (2016) 248 Cal.App.4th 966, 1003 ["'[W]e may not simply rewrite the statutory scheme, purporting to sit as a super-Legislature'"]; *DeNike, supra*, 76 Cal.App.5th at p. 384 ["'we will not read a requirement into a statute that does not appear therein'"].) The Ordinance, therefore, violates the Act's plain language by reducing the intensity of land use in the R-1 zone to below what was allowed under the City's zoning ordinance that was in effect on January 1, 2018.

3.     *The Act's Plain Language is Consistent with the Legislature's Purpose*

Given the Act's plain meaning, it is not necessary to consider the City's contention that the legislative history demonstrates that a different construction was intended.

14

Nevertheless, the legislative history is consistent with our reading.

"The plain meaning of the words of a statute may be disregarded only when the application of their literal meaning would (1) produce absurd consequences that the Legislature clearly did not intend or (2) frustrate the manifest purposes that appear from [the statute's] provisions . . . when considered as a whole in light of its legislative history." (*Martinez v. City of Clovis* (2023) 90 Cal.App.5th 193, 239 (*Martinez*); see also *California State University, Fresno Assn., Inc. v. County of Fresno* (2017) 9 Cal.App.5th 250, 266 ["'The plain meaning of words in a statute may be disregarded only when that meaning is "'repugnant to the general purview of the act,' or for some other compelling reason . . .'"'''].)

Legislative declarations and findings indicate the Act should be interpreted in a manner that offers expansive housing protection and limits the ability of local governments to interfere with housing construction. While the Legislature certainly recognized a need for more housing units (see e.g., Stats. 2019, ch. 654, § 2(a)(4) (Sen. Bill No. 330)), the Legislature also found the causes of the housing crisis "are multiple and complex." (See § 65589.5(a)(2)(B) [amended as part of the Act in Sen. Bill No. 330].) They include lengthy permitting processes, high fees for producers of housing, and local government decisions that thwart the development of housing. (Stats. 2019, ch. 654, §§ 2(a)(10), 3(a)(1)(D) (Sen. Bill No. 330).) Indeed, the Legislature described one of the purposes of the Act as follows: "At a time when housing is so desperately needed, there are some local policies that should just be off limits. [Senate Bill No.] 330 is a targeted approach that prohibits the most egregious practices

in the areas where housing is most needed. It prevents local governments from downzoning unless they upzone elsewhere, and it stops them from changing the rules on builders who are in the midst of going through the approval process." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 330 (2019–2020 Reg. Sess.) as amended Aug. 12, 2019, pp. 7–8.)

The Legislature confirmed the Act's intent to broadly prohibit any local policies that lessen housing intensity when it enacted the 2022 amendments. In discussing the prohibition on reducing the intensity of land use and zoning ordinance amendments, the Legislature recognized that an affected city had to "ensure that there is no net loss in *residential capacity*." (Stats. 2021, ch. 161 (Sen. Bill No. 8), italics added .)

The City repeatedly argues that the Act's plain language will lead to bigger homes, but the Act does not increase the allowable FAR of dwellings. Furthermore, there are circumstances where the allowable FAR of a home and the number of bedrooms relate directly to a lot's residential capacity, such as with multi-generational households.[5] For example, before the Ordinance was adopted, one resident emailed a City staff member explaining that the reduced FAR would not allow

---

[5] "The 'extended family' that provided generations of early Americans with social services and economic and emotional support in times of hardship, and was the beachhead for successive waves of immigrants who populated our cities, remains not merely still a pervasive living pattern, but under the goad of brutal economic necessity, a prominent pattern-virtually a means of survival for large numbers of the poor and deprived minorities of our society. For them compelled pooling of scant resources requires compelled sharing of a household." (*Moore v. City of East Cleveland* (1977) 431 U.S. 494, 508, Brennan, J., concurring, footnotes omitted.)

her to add space to her family's home to house her elderly, disabled father. When the City staff member responded that the resident could build an ADU for her father, the resident explained she could not afford the cost to "install a kitchen, bath, run plumbing, increase the electrical, and install a separate HVAC . . . ."

Subdivision (b)(1)(A)'s express definition of "reducing the intensity of land use" does not produce absurd results or frustrate the purpose of the Act. (*Martinez*, *supra*, 90 Cal.App.5th at p. 239.) The legislative history shows an intent to ensure that local governments do not enact policies that delay housing development or reduce a lot's residential capacity.

4.    *The Ordinance is Not Exempt from Section 66300*

The City contends that the Ordinance does not violate section 66300 because the Ordinance facilitates the development of housing for lower-income households and an increase in density. We conclude that the City fails to show that the Ordinance falls within an exception of section 66300.

Subdivision (j) of section 66300 states, "Notwithstanding subdivisions (b) and (f), this section does not prohibit an affected city or an affected county from enacting a development policy, standard, or condition that is intended to preserve or *facilitate the production of housing for lower[-]income households*, as defined in Section 50079.5 of the Health and Safety Code, or *housing types that traditionally serve lower[-]income households*, including mobilehome parks, single-room occupancy units, or units subject to any form of rent or price control through a public entity's valid exercise of its police power." (Italics added.) Subdivision (f)(3) instructs that section 66300 is not to be

17

construed as prohibiting the adoption or amendment of a zoning ordinance that: "(A) Allows greater density. (B) Facilitates the development of housing. (C) Reduces the costs to a housing development project."

The City does not establish that the Ordinance satisfies the exemption set forth in section 66300, subdivision (j). First, the City does not contend that the Ordinance is "intended to preserve or facilitate the production of housing for lower[-]income households, as defined in Section 50079.5 of the Health and Safety Code . . . ." Second, while ADUs may offer relatively affordable housing in some circumstances,[6] the City does not point to anything in the record showing that ADUs within the City tend to house lower-income households. Notably, the City does not respond to YIMBY's assertion that ADUs are market-rate units that can be rented to any household regardless of income. The Legislature's intent was for any exception to be construed narrowly (§ 66300, subd. (f)(2)), and the City does not show that the Ordinance facilitates the production of housing types similar to mobile home parks, single-room occupancy units, units subject to any form of rent or price control, or units that traditionally serve lower income households.

---

[6] In asserting that ADUs offer lower cost housing, the City relies on legislative findings from 1982 relating to section 65852.150, part of the statutory provisions governing planning and zoning (section 65000 et seq.). (Stats. 1982, ch. 1440, § 1, operative July 1, 1983.) The City, however, does not show that section 65852.150's legislative intent was to address the same issues as the Act. (See § 65800 ["the Legislature declares that in enacting this chapter it is its intention to provide only a minimum of limitation in order that counties and cities may exercise the maximum degree of control over local zoning matters"].)

The City does not establish that subdivision (f)(3) requires a different outcome either. The City does not show that the Ordinance allows greater density. While the City claims that it believed reducing the permitted FAR for housing in the R-1 zone would "open up property owners' minds to including an ADU or JADU on their property," it admits the Ordinance does not actually change the number of housing units that can be built on an R-1 zoned lot. As ADUs could be built before or after the passage of the Ordinance, the City acknowledges "[i]t does not change the density of housing permitted on an R-1 lot." Moreover, the City does not show the Ordinance would facilitate the development of housing, when its goal is to lower the living space within a house. Finally, while the City asserts that the Ordinance reduces housing development costs generally, the City neither cites to anything in the record to support this claim, nor shows that the Ordinance reduces the cost of a particular housing development project.

## B.     Attorney Fees

### 1.     *The Trial Court Did Not Abuse its Discretion in Awarding YIMBY Attorney Fees Under Code of Civil Procedure Section 1021.5*

The City argues that YIMBY's attorney fee award must be reversed because the judgment does not confer a benefit on a large class of persons or a significant segment of the public as there is no consensus on what the housing policy should be regarding single-family residential development. We are unpersuaded by this argument.

Under Code of Civil Procedure section 1021.5, ""'[e]ligibility for . . . attorney fees is established when '(1) [the moving party's]

action "has resulted in the enforcement of an important right affecting the public interest," (2) "a significant benefit, whether pecuniary or nonpecuniary[,] has been conferred on the general public or a large class of persons" and (3) "the necessity and financial burden of private enforcement are such as to make the award appropriate.""'" [Citation.]'" (*Early v. Becerra* (2021) 60 Cal.App.5th 726, 736 (*Early*).)  Here, the City is challenging the second element.

"'"The determination whether a party has met the requirement for an award of fees and the reasonable amount of such an award are matters best decided by the trial court in the first instance.  [Citation.]  That court ""'must realistically assess the litigation and determine from a practical perspective whether the statutory criteria have been met.'""" [Citation.]  We will uphold the trial court's decision to award attorney fees under section 1021.5 unless the trial court abused its discretion.  [Citation.]  In making this determination we review the entire record, noting the trial court's stated reasons for awarding fees and whether it applied the proper standards of law in reaching its decision.  [Citation.]'  [Citation.]  We will reverse the trial court's determination only if the resulting injury ""''is sufficiently grave to amount to a manifest miscarriage of justice,'""" and "'no reasonable basis for the action is shown.'"  [Citation.]'  [Citation.]" (*Early, supra*, 60 Cal.App.5th at p. 736.)

The trial court did not abuse its discretion in ruling that YIMBY's lawsuit conferred a significant benefit on the general public and a large class of persons, including the City's current and future residents, by enforcing important housing rights.  The Legislature has declared that lack of housing is a "critical problem that threatens the economic, environmental, and social

20

quality of life in California." (§ 65589.5, subd. (a)(1)(A).) Many Californians are inadequately housed or lack housing altogether, costing the state $140 billion a year in lost economic output. (Stat. 2021, ch. 161, § 2, pp. 37–39 (Sen. Bill No. 8).) The trial court could have reasonably found that YIMBY advanced the public's interest in the development of housing by challenging an ordinance that reduced the intensity of land use and residential capacity. (See *Indio Police Command Unit Assn. v. City of Indio* (2014) 230 Cal.App.4th 521, 543 ["The courts are not required to narrowly construe the significant benefit factor"].)

As to the City's contention that "the judge adopted the Legislature's view of what the state's policies regarding single[-]family residential housing should be," legislative enactments are expressions of public policy. (*English v. Marin Municipal Water District* (1977) 66 Cal.App.3d 725, 730, disapproved on other grounds in *Delta Farms Reclamation District v. Superior Court* (1983) 33 Cal.3d 699, 707.) The City fails to show that the trial court's reliance on the Legislature's view of what benefits the public amounted to a manifest miscarriage of justice.

Moreover, the City does not cite any authority to support the proposition that a consensus about a policy is required to find that a significant benefit has been conferred on the general public or a large class of persons.[7] Indeed, people often disagree about

---

[7] We previously granted the City's request to take judicial notice of two actions pending in Los Angeles County Superior Court: *City of Redondo Beach, et al., v. Bonta*, Case Number 22STCP01143, and *City of Rancho Palos Verdes, et al., v. Bonta*, Case Number 22STCP02369. The City provides that these other actions concern Senate Bill No. 9, which allows splitting lots and constructing two housing units on each *Fn. continued on the next page.*

21

whether a particular policy serves the greater good. As to the City's claim that a greater number of public comments from people in the community were in favor of lowering the intensity of housing, the record shows that the residents' comments were primarily concerned with maintaining the existing character of their neighborhoods and did not contemplate the impact that the Ordinance would have on the housing crisis.

2. *The Trial Court Did Not Abuse Its Discretion in Awarding a Multiplier*

As noted, the lodestar amount was calculated as follows: $90,405 for YIMBY's counsel's work on the merits of the case, $9,310 for work on the motion for attorney fees, and $9,497.33 for time spent on the reply brief filed in support of the motion. The court then applied a multiplier of 1.25 to the $90,405 worth of work on the merits (($90,405 x 1.25) + $9,310 + 9,497.33 = $131,813.58). The City challenges only the multiplier, arguing it was based on improper factors. We find no error.

"Where attorney fees are awarded under section 1021.5, 'the fee setting inquiry ordinarily begins with the "lodestar," i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate.' [Citation.] 'Next, the court engages in the multiplier analysis, and determines whether the lodestar figure should be augmented or diminished by one or more relevant factors' . . . ." (*Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 736–737.) Factors that

---

lot in single-family residential zones. The fact that other cities have filed lawsuits concerning different legislative actions has little relevance to determining whether YIMBY's writ action conferred a substantial benefit on the general public or a large class of persons.

the court may consider in adjusting the lodestar include "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)  However, "'[t]here is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation,'" any one factor "may be responsible for enhancing or reducing the lodestar." (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 947.)

"'The award of a multiplier is in the end a discretionary matter largely left to the trial court.' [Citation.]  'We will not disturb the trial court's exercise of discretion in deciding whether to increase or reduce the lodestar figure unless the fee award is clearly wrong [citation], and we may "presume the trial court considered all the appropriate factors in choosing the multiplier and applying it to the whole lodestar"' [Citation.]" (*Kennedy Com. v. City of Huntington Beach* (2023) 91 Cal.App.5th 436, 467 (*Kennedy Com.*); see also *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615 [we apply an abuse of discretion standard in reviewing a trial court's decision to apply a multiplier] (*Ramos*).)  "'The only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination.' [Citation.]" (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1509 (*Loeffler*).)

Here, the trial court applied the multiplier after considering multiple factors, including (1) the writ petition presented questions of first impression involving the Act, (2)

23

YIMBY's lawyers presented the case effectively in achieving YIMBY's litigation objective, (3) YIMBY's attorneys' hourly rates were on the low side for comparable cases in Los Angeles, such that the difficulty and novelty of the questions presented were not fully reflected in the lodestar amount, (4) the fee award would substantially inure to the benefit of YIMBY, a non-profit organization, and (5) the fee award would ultimately be paid by taxpayers.

First, the City contends that because there is case law on the interpretation of statutes generally, the issues presented were not "particularly novel." However, there is no published authority addressing the proper interpretation of section 66300, and thus, the trial court did not abuse its discretion in considering the novelty of the questions presented. (See *Sonoma Land Trust v. Thompson* (2021) 63 Cal.App.5th 978, 986 (*Sonoma Land*).)

Second, the City contends the trial court improperly considered YIMBY's lawyers' low hourly rates and skill when awarding the multiplier, when these factors "should have been addressed by the trial court in determining the lodestar amount." This argument fails. In calculating the lodestar amount, the court accepted the hourly rates of YIMBY's counsel, noting that "[the City] ma[d]e no argument to the contrary." It was within the court's discretion to then enhance the lodestar amount because the rates were on the low side and did not fully reflect the skill of the attorneys or difficulties of the case. (*Sonoma Land, supra*, 63 Cal.App.5th at p. 988; see *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 628 [1.25 multiplier was not an abuse of discretion, particularly in light of finding that hourly rate of plaintiffs' attorneys was in the "'low

24

range' of reasonable"].) This is precisely what the court did. To the extent the City asserts that YIMBY's attorneys did not show special skill in this case, we will not second-guess the trial court's assessment. (See *Loeffler*, *supra*, 174 Cal.App.4th at p. 1509.)

Next, the City asserts that the court improperly considered YIMBY's success in achieving its litigation objective because success is relevant only in determining whether a party is entitled to fees. The City does not cite any authority holding that the result the attorneys achieved cannot be considered in applying a multiplier. Indeed, case law indicates the trial court has discretion to take the results obtained by YIMBY into account. (See e.g., *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [court can consider "success or failure" in determining value of legal services]; *Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 489 [court has discretion to take into account a variety of factors in applying a multiplier, including "the results obtained"].)

Furthermore, the City argues that it was improper for the trial court to justify the payment of the fee award by taxpayers based upon the City's prelitigation refusal to amend the Ordinance to comply with the Act, as this was relevant only to YIMBY's entitlement to fees. The case that the City cites for this proposition, *Ramos*, *supra*, 82 Cal.App.4th 615, is inapposite. *Ramos* involved an attorney fees award in a class action against a mortgage lender that settled prior to trial. (*Id.* at pp. 618–619.) The award was reversed with directions to the trial court to "exercise its discretion anew," as it did not articulate reasons for applying a multiplier to the fee award in the first instance. (*Id.* at p. 619.) Consideration of taxpayers' interests in the payment of fees was expressly recognized as "not pertinent" in *Ramos*. (*Id.*

25

at p. 623, fn.2.)  To the extent that it considered the effect of settlement discussions generally, the *Ramos* court indicated that because the lender agreed to settle before trial, enhancing the fee award might subvert the policy in favor of settlement.  (*Id.* at p. 627 ["Here, for example, it might be said that the parties' willingness to compromise should be a factor in setting a reasonable fee, including the choice of any multiplier used"].)  In this case, however, the City did *not* settle, so the policy in favor of settlement would not be subverted by use of a multiplier.  Thus, the City fails to show that it was improper for the court to apply a multiplier, even though the fee award would be paid by taxpayers, where the court found the City's elected representatives had a meaningful opportunity to avoid litigation.

Finally, contrary to the City's claims, there is no showing that the trial court applied the multiplier to punish the City.  The court applied a more modest 1.25 multiplier to the lodestar solely for the work done on the merits of the case, after rejecting YIMBY's request for a 3.0 multiplier.[8]  The court articulated numerous non-punitive, rational reasons for applying the multiplier.  Based on the foregoing, the City fails to establish that the trial court abused its discretion in awarding the multiplier. (*Loeffler*, *supra*, 174 Cal.App.4th at p. 1509; *Kennedy Com.*, *supra*, 91 Cal.App.5th at p. 467.)

---

[8]     The City does not dispute that it was proper for the court to consider that the attorney fee award would substantially inure to YIMBY's benefit, a non-profit organization.  While the City seemingly questions the truthfulness of Trauss's statements about YIMBY's limited litigation budget, the City fails to point to anything that shows such statements were untrue.

## DISPOSITION

The judgment and order are affirmed.  YIMBY is awarded costs on appeal.


MORI, J.

We concur:


CURREY, P. J.


ZUKIN, J.